## ED MAYES v. STATE.

No. A-1921. Opinion Filed September 9, 1914.

(142 Pac. 1049.)

1. **PARTIES TO OFFENSES**—Accomplice—Receiver of Stolen Goods. The person or thief who steals property is not an accomplice of the person who receives from him the same stolen property knowing it to be stolen. The thief and the receiver of the stolen goods are each independent criminals, guilty of separate and distinct offenses.

2. **PARTIES TO OFFENSES**—"Accomplice." The test by which to determine whether one is an accomplice is to ascertain whether or not he could be indicted or informed against for the offense for which the accused is being tried.

3. **EVIDENCE** — Accomplices — Corroboration — Necessity. In the prosecution of a person charged with receiving stolen goods knowing them to be stolen, the thief who stole the goods, not being an accomplice, is a competent witness on behalf of the state, and his testimony requires no corroboration under our statute.

(Syllabus by the Court.)

*Appeal from District Court, Beckham County;*
*James R. Tolbert, Judge.*

Ed Mayes was convicted of receiving stolen property and appeals. Affirmed.

*Hendrix & Tracy* and *J. A. Minton,* for plaintiff in error.

*Smith C. Matson* and *C. J. Davenport,* Asst. Attys. Gen., for the State.

ARMSTRONG, P. J.   The plaintiff in error, Ed Mayes, was convicted at the October, 1912, term of the district court of Beckham county on a charge of receiving stolen property, and his punishment fixed at imprisonment in the state penitentiary for a period of three years.

On behalf of the state, George Montgomery testified that he was 24 years old and was acquainted with Ed Mayes, the defendant; had known him for several years; witness' home was and had been for five years in Gray county, Tex.; that he was acquainted with Carl Talley and J. W. Talley; that they live in Gray county, near Pampa, Tex.; that witness is acquainted with Wallace Fletcher and had known him for several years; was acquainted with Wallace Fletcher on January 8, 1909; that in January, 1909, witness was working on the farm for Ed Wright; that he was acquainted with two brown horses owned by Carl Talley in Pampa, Tex., in January; that shortly after the 18th of January, 1909, he had a business transaction with Grover Till in Erick, Okla., in which he traded to Till a brown horse which he had gotten from Ed Mayes, the defendant; that the horse was brought to Oklahoma by witness and Wallace Fletcher; that witness and Wallace Fletcher got the horse about the 18th of January, 1909, at Ed Wright's place, in Gray county, Tex.; that Hicks and Wallace Fletcher were there at that time; that they came to Ed Mayes' place in Beckham county, Okla., together; that witness took one horse and Wallace Fletcher took the other; that they arrived at Ed Mayes' place about 11 o'clock in the forenoon; that Mayes and his wife were present; that witness and Wallace Fletcher told Mayes that the horses were stolen; that Fletcher told Mayes he wanted to leave the horse he was riding with him; that the horse was

a dark brown, weighing about 1,100 pounds, branded with a half circle "J" on the left shoulder; that witness took the horse he was riding back to Texas and told Ed Mayes he was doing this because the horse was a stolen horse; Wallace Fletcher had two horses with him; that he led one and rode one; that they reached Ed Mayes' place about 11 o'clock and went to the pasture across the creek from where Ed Mayes' house was; that they went to a "shinnery" patch and stayed there the rest of the day; did not have anything to eat that day; that they had breakfast and supper at Bob Moler's house, a brother-in-law of witness; that they stayed in the chinnery patch until late that day, and then Fletcher and witness went to Bob Moler's and left the horse Fletcher rode in the "shinnery" patch in Mayes' corral; that they stayed at Bob Moler's until about 3 o'clock and started home; they went by another man's pasture and got a mare out of the stable and took her back; that Ed Mayes told them where that mare was; that the mare belonged to a man by the name of Staggs; that they took the mare to Ed Wright's place in Texas; that the other horse they took back and turned loose on the range five or six miles from Pampa, and then went to Ed Wright's place; that witness rode a horse which he had at the Fletcher boys' place; that witness then worked for Ed Wright a while, and came back to Oklahoma and went to Moler's place; that he saw Ed Mayes and had a conversation with him with reference to the horse; that Mayes told witness that he and others had bought the right to the horse, and, if he could find the horse, he was theirs; that Mayes wanted to trade the horse off; that this was about the 18th or 20th of February; that witness took the horse and traded him to Grover Till; that he got a bay horse in the trade and took him and turned him over to Ed Mayes, who was in Erick that day; that witness had a conversation with Mayes in town in which he (Mayes) pointed out Mr. Till on the street and showed witness the man and the horse, they were both on the street, and witness went over to Till and made the trade; that Ed Mayes paid witness $5 for making the trade; that the bay horse which witness got in the trade he rode back to Ed Mayes'; the next

day Mayes sent back to Texas, by witness, $25 to the Fletchers and $25 to J. E. or Ed Wright; that witness gave Ed Wright a check for $25 drawn upon Thurmond's bank in Sayre; that the check was signed "C. P. Mayes"; that witness saw Ed Mayes sign the check; that Ed Mayes gave the check to witness to be delivered to Ed Wright; and that he delivered it. Witness was arrested in Texas in connection with the horses and was put in jail at Canadian, Tex.; that he was brought to Oklahoma by the sheriff and had a preliminary hearing; that after the preliminary hearing, witness told the officers about these transactions; that witness had never been prosecuted; that on the day before the trial he was in attendance at 9 o'clock in the court; that he had a conversation with Mayes down on the street in which Mayes asked witness to leave and not appear and appealed to witness' sympathy; that he told witness they could not prosecute him (witness) because the statute of limitation had run; that Mayes and witness talked about the matter, and witness decided to leave and did leave; that Bob Moler brought a ticket to witness; that no one was present during this conversation; that witness came back the night before the trial; that Ed Mayes received the horse in Beckham county; that the horse was stolen from Carl Talley. Wallace Fletcher told Ed Mayes, at the time the horse was left with him, that it was stolen and that it was not Fletcher's horse.

J. W. Talley, on behalf of the state, testified that he lived at Pampa, Gray county, Tex., and is the father of Carl Talley; that in January, 1909, he was acquainted with two brown horses which Carl Talley owned; the horses were missed; witness looked for them; the last time they had seen them was on Saturday; later he saw one of the horses at Erick, Okla; the other horse was brought home; that the horse found at Erick was a dark brown about 15 hands high, weighed about 1,100 pounds, branded a half circle "J" on the left shoulder; the horses sold at different times for $300; that there was not much difference between the horses; they were very much alike; the horse found at Erick was shipped back to Texas.

Cr. 11—2

Carl Talley, on behalf of the state, testified that he was a son of J. W. Talley; that in January, 1909, he was living at Pampa, Tex., and was the owner of two brown horses branded a half circle "J" on the shoulder; they disappeared about the 18th of January; that they had° been turned out on Saturday night, and Sunday morning they failed to come up; that they did not begin to search for them until Tuesday; they found one horse the following Saturday; that Hicks Fletcher was taking the horse to witness; the other horse was found at Erick, Okla., in the spring; that he had never given anybody permission to take the horses; that the taking was against his will and his consent; that the horse in question was stolen from him about the 18th of January, 1909.

Grover Till, on behalf of the state, testified that in February, 1909, he was living at Erick; that he saw George Montgomery during that month in a wagonyard at Erick, and traded him a bay horse for a brown, and sold the brown horse to Mr. Martin; that he first saw Montgomery that day coming from where Ed Mayes was standing on the corner by the First National Bank; witness was standing in front of the post office; saw George Montgomery coming about ten feet from Mr. Mayes; Mayes was talking to some one; that Montgomery asked witness if he would trade horses; witness did not know Montgomery at the time and told him he would not trade, but finally he did make a trade.

Guy Ford, for the state, testified that he was in the banking business in Sayre; was cashier of the First National Bank and had been for about seven years; that the bank keeps records showing the dates the checks are paid, the persons drawing the checks, the payee, and the amount; that on March 11, 1909, a check signed, "C. P. Mayes," payable to J. E. Wright, for $25, passed through the bank; that C. P. Mayes had an account in the bank; and that C. P. Mayes was the wife of the defendant; that the bank honored checks of the defendant when signed, "C. P. Mayes."

J. W. Talley, recalled for the state, testified that he was acquainted with Ed (or J. E.) Wright; that he saw Montgomery working there at Wright's.

On behalf of the defense, Tim Frost testified that he lived in Erick about January 18, 1909, and in February also; that he had seen George Montgomery once or twice; that he remembered about the date when Grover Till traded for a horse from Montgomery; that about that time he saw a man supposed to be Montgomery; that the man sitting there in court looked like the man, but witness could not swear whether he was or not; had a few words with him in which the man tried to trade horses with witness, or witness tried to trade with him; that the man offered to trade a brown horse weighing about 1,000 or 1,100 pounds; on that same day the man tried to trade horses with John Long; that the horse the man was trying to trade was the same horse afterwards traded to Grover Till.

F. O. Funderburk, for the defense, testified that he lived in Erick and had been living there about eleven years; that he was acquainted with defendant and with Grover Till; that he remembers the transaction in which Grover Till traded for a horse from Montgomery; that he was in Erick late that evening; that in the forenoon he went over to a place east of Sweetwater to see Mr. Mayes, and saw Mr. Mayes with a bunch of cattle; that this was about 11 or 11:30 o'clock; that he saw Grover Till there that afternoon and heard people guying him about the trade.

W. A. Poindexter, for the defense, testified that he knew George Montgomery when he saw him; that on the day before the trial he was at home during all the forenoon; that he believes he went to the post office, but was at home all of the time with the exception of the time required to go to the post office; that he saw Ed Mayes at his place; that he saw Montgomery standing out in front; that he did not see Mayes speak to Montgomery at all.

Counsel devote their whole effort in a well-prepared brief to the discussion of the proposition that there is a total lack of evidence corroborating the testimony of George Montgomery.

They apparently assume that Montgomery was an accomplice, and therefore his testimony would require corroboration before a conviction could stand. In this position counsel are wholly wrong. Montgomery was not an accomplice in the sense contemplated by the statute, and, even if he were, he is amply corroborated. The testimony detailing the transaction is clear-cut and convincing and was not weakened by the grilling cross-examination at the hands of counsel for plaintiff in error. The evidence of Montgomery, and especially his evidence brought out on cross-examination by counsel for plaintiff in error, shows that he was present when the horses were stolen, and in fact participated in the larceny in Texas.

The trial court fell into the error of treating state's witness Montgomery as an accomplice, under what theory we are unable to determine. Counsel in their brief take the position that Montgomery stole the horse in Texas. This being true, then no corroboration is necessary, for it is the law that a thief of goods is not an accomplice of the receiver of the same stolen goods. In *Springer v. State,* 102 Ga. 447, 30 S. E. 971, the Supreme Court of Georgia says:

"The actual thief, relative to the receiver of stolen goods, is an independent criminal, and, although he may commit the larceny by which he possesses himself of stolen goods, he does not and cannot participate with the receiver of such goods in the special offense committed by the latter in receiving such goods knowing them to be stolen."

There are many definitions of an accomplice as that term is used in our statute and in the connection it is here being discussed. We are of opinion that:

"The test by which to determine whether one is an accomplice is to ascertain whether he could be indicted for the offense for which accused is being tried." (12 Cyc. 445, 446.)

If this is a true test, and we think it is, then the rule requiring corroboration as provided by our statute could not be invoked. It is well understood that:

"A thief is not an accomplice of one who receives the goods knowing them to have been stolen, for the larceny and the receiving of the goods are separate and distinct offenses."

Under the facts disclosed by this record, Montgomery could not have been indicted and convicted for receiving stolen property.

Counsel's argument, as an abstract proposition, is sound; but it does not apply in the class of cases here discussed. Counsel seek to have this court declare a rule, that he who steals property shall be considered an accomplice of the person who receives the same property. We are unwilling to assist organized horse thieves in any such manner. The doctrine announced by the Georgia case, *supra*, appeals to us as being in the interest of the law-abiding public. No member of this court desires a rule that will permit an innocent man to be punished. Neither do we desire to open up the way for the good citizenship of the state to be plundered by thieves.

The only other assignment is based on the introduction of a check which the evidence showed was given by the plaintiff in error as compensation to one of the thieves who stole the horse in Texas. We think the testimony was properly admitted. The state's testimony showed who gave it, for what purpose it was given, and that it was received by the thief to whom it was sent, and that a check for a like amount was paid by the bank upon which it was drawn. No one denies any of these propositions. The jury therefore were entitled to consider them in reaching their conclusions.

Finding no prejudicial error in the record, the judgment of the trial court is affirmed.

DOYLE, J., concurs. FURMAN, J., absent and not participating.