ROBERT R. FITZGERALD v. STATE.

No. A-10561.   Dec. 22, 1947.
(188 P. 2d 396.)

Clayton Carder, of Hobart, and J. B. Dudley, of Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

HORTON, Special J. The defendant Robert R. Fitzgerald, together with Leon C. Phillips, was charged in the district court of Oklahoma county, Okla., August 10, 1943, by information filed on said date charging them in the first count thereof with the crime of conspiracy to receive bribes in connection with the issuance of executive clemency to one J. W. Eisiminger, a prisoner serving a life sentence upon the charge of murder in the Oklahoma State Penitentiary at McAlester, Okla., and the second count charging them with the crime of bribery in connection with the same transaction. Both the defendant Robert R. Fitzgerald and the said Leon C. Phillips entered pleas of not guilty. A severance was granted, following which the state elected to proceed to trial, first against the defendant Robert R. Fitzgerald; thereafter the state dismissed the second count of the information without prejudice to further prosecution and proceeded to trial against the defendant Robert R. Fitzgerald upon the first count of the information charging the crime of conspiracy. Thereafter the defendant was tried, convicted and sentenced to pay a fine of $500 and costs. He has perfected an appeal to this court.

In substance the first count in said information charges that on February 9, 1942, and for a long time

prior thereto, Leon C. Phillips and defendant conspired and agreed with each other and with one Fred D. Lowe and one William H. Strong, and with divers other persons to the informant unknown, to procure a bribe for the issuance of clemency to J. W. Eisiminger, detailing that on February 1, 1941, defendant Phillips did cause Lowe, theretofore his personal investigator, to be appointed tag agent for Oklahoma county, Okla., and on or about August 1, 1941, cause defendant Fitzgerald, theretofore his personal investigator, to be appointed to the office of Pardon and Parole officer in the office of the Chief Executive of the State of Oklahoma. Continuing it charges seven separate overt acts in connection with the issuance of two paroles to Eisiminger.

It appears from the record that in June, 1941, Dr. J. W. Eisiminger, an osteopath, was serving a life sentence in the State Penitentiary at McAlester, Okla., for a conviction entered in the district court of Oklahoma county on a plea of guilty to the crime of murder, the charge being based upon the death of a young woman who died as the result of an illegal abortion charged as performed by Eisiminger. At such time Eisiminger was also under a sentence of 15 years as the result of a conviction on a plea of guilty entered to a charge of perjury and conspiracy in the United States District Court at Houston, Texas, the conviction providing the sentence should run concurrently with the life sentence for murder assessed in the Oklahoma case and further providing that should Eisiminger be released from the Oklahoma State Penitentiary prior to the expiration of 15 years, he was to be delivered to the United States Penitentiary at Leavenworth, Kans., to complete the 15 year sentence imposed by the Federal Court.

In June, 1941, Marie Eisiminger, his wife, met C. D. McNally, and discussed with him the matter of obtaining clemency in regard to the federal conviction. Shortly thereafter the two interviewed Eisiminger at the State Penitentiary, following which McNally made a trip to Washington, D. C., taking an application for federal clemency for Eisiminger. While there he was advised the application was premature until such time as Eisiminger was pardoned in connection with the Oklahoma offense and released from the State Penitentiary.

About three months following McNally's return to Oklahoma and in November of 1941, he suggested to Mrs. Eisiminger that they appeal to William A. Strong for assistance, stating that Strong had a friend, Fred D. Lowe, who could be of assistance in procuring executive clemency. Mrs. Eisiminger interviewed Strong in December of 1941 and was advised by him it would take $10,000 to procure the pardon—$5,000 for the Governor, the balance to be divided between Strong and Lowe. Mrs. Eisiminger offered to pay $1,000 for a pardon and after negotiation the amount to be paid was by agreement fixed at $8,-000 and on January 9, 1942, Strong and Mrs. Eisiminger entered into a written escrow agreement conditioned that if Strong procured the pardon he was to be paid that amount, the money and contract being placed with an Oklahoma City bank as escrow agent. During the times mentioned defendant was serving as chief investigator out of the office of the Governor but his principal duties appeared to be in connection with the administration of the Pardon and Parole Office, there being no Pardon and Parole Attorney at such time. In January 9, 1942, the date of the escrow agreement, the defendant gave the petition for federal clemency to Mrs. Ruth Page, clerk of the

Pardon and Parole Office, asked her opinion of its contents, and then suggested she write Mr. Lewis Morris, the county attorney who handled the state prosecution of Eisiminger, for an opinion in the matter which was done. Later defendant and Lowe inquired of Mrs. Page whether an answer had been received in response to this letter, and on January 15, 1942, jointly suggested to her that she write a second letter. Pursuant to this letter, a reply was received from Mr. Morris in which he reviewed the history of the case but made no recommendation with reference to clemency, stating that as far as his office was concerned it was a closed matter. Defendant then directed Mrs. Page to prepare a file of the case for the Governor. She thereupon prepared a digest of the Eisiminger file and delivered it to defendant.

Later the Governor called her and stated the file wasn't complete, suggesting its completion with recommendation by defendant and herself, which was done, and thereafter, and on February 5, 1942, a parole for Eisiminger was issued and delivered to the Pardon and Parole Office, Mrs. Page delivering it to defendant who in turn delivered it to Lowe, who was in his office at the time. Lowe delivered the parole to Strong the same day, who then met with Mrs. Eisiminger, who strongly objected to the fact that a pardon had not been issued, and refused to accept the parole. Two days later Lowe and Strong persuaded Mrs. Eisiminger to accept the parole, the parties then going to the bank where the $8,000 was paid to Strong who then paid McNally $1,250, Lowe $1,500 and kept the balance. The next morning Mrs. Eisiminger visited her husband in the penitentiary and showed him the parole, which he refused to accept. She returned to Oklahoma City with the parole and employed an attorney, Jean

P. Day, to sue Lowe and Strong for the return of the money. On February 27, 1942, a second parole was issued, the defendant and Mrs. Eisiminger's attorney taking the parole to McAlester where, after some hesitation, it was accepted by Eisiminger. There was no material dispute as to any of the above facts.

In addition, Fred Lowe testified that when Strong solicited his assistance the latter stated he would give $1,000 if he could obtain a pardon for Eisiminger; Strong gave him the petition for federal clemency, which he took to the Governor, discussed the case with him and stated $1,000 had been offered for clemency. He testified it was decided the money should be used to employ Senator Robert Burns to present the case to the Governor. Upon Burns' refusal to present the case, he saw the Governor again and asked what could be done and was advised to see the defendant Fitzgerald, the Governor stating that "he was giving him some loose rope." He then saw defendant, told him $1,000 had been offered and defendant stated he had talked to Eisiminger and would do whatever he could and later suggested he obtain a letter of recommendation from Mr. Morris. Lowe testified that no actual agreement was reached with the Governor that he would accept any part of the money, and that only a "tacit" understanding existed between defendant and him. On February 27, 1942, Strong delivered $1,500 to him and the following week he delivered $500 of the money to the Governor and $500 to the defendant. After the first parole had been issued, but before the second, and in response to a 'phone call from the Governor, he went to the mansion early one morning where the Governor advised him the case was getting hot and if something couldn't be done he would have to revoke the parole. The witness

then advised the Governor he didn't know what he could do, but would see, and further stated that if the Governor revoked the parole without giving Eisiminger a chance to accept or reject it, the situation created would embarass the Governor. He inquired of the Governor if he could issue a second parole and send it down to Eisiminger for acceptance or rejection,. to which the Governor replied in the affirmative.

Jean P. Day testified that when he was employed by Mrs. Eisiminger she stated she was primarily interested in procuring a pardon for her husband but if one could not be obtained, she wanted to recover her money. He subsequently talked to Lowe who later phoned him and advised him the Governor had issued a second parole which was to be taken to Eisiminger for acceptance or rejection and that if he desired, he could go down to the penitentiary with the person who was to deliver the parole. Desiring to ascertain the wishes of Eisiminger in the matter, he, as directed by Lowe, appeared the next morning at the office of the Pardon and Parole Attorney where defendant advised him, "I believe you are going to McAlester with me." En route to McAlester defendant stated the thing for Eisiminger to do was to accept the parole and if it proved necessary, a pardon be issued as a condition for federal clemency, he felt sure one would be granted prior to the expiration of the Governor's term. During the interview with Eisiminger the latter expressed doubt he could obtain federal clemency while under parole and defendant stated to Eisiminger he felt it would make no difference but if it did, he was certain the Governor would grant a pardon prior to the expiration of the Governor's term.

J. W. Eisiminger testified he was a federal prisoner at Leavenworth, Kan. That he first talked to McNally about clemency and later talked to defendant on an occasion when defendant was at McAlester and requested professional treatment from him. He refused the first parole because his wife advised him she had been promised a pardon and was going back and make the parties make good on their promise. Defendant and Mr. Day brought the second parole down and when he questioned the advantage of having a parole in connection with federal clemency, defendant advised him that if the parole interfered with federal clemency, he would see that the Governor issued a pardon and was advised that if he would help them, they would help him. He then inquired, "Mr. Fitzgerald, will it help you if I accept this parole?" and defendant answered "Yes, we could get things straightened out." He then further inquired what assurance he had that he would receive a pardon and defendant stated, "Now I'm the Governor's agent. Any agreement I make with you the Governor is duty-bound to carry out." That he signed and accepted the parole and was subsequently delivered to the federal penitentiary at Leavenworth.

S. H. Singleton testified he was chairman of the Highway Commission during the Phillips administration. Some time between February 5, and February 27, 1942, Bill Sigley and some other men brought a photostat copy of the $8,000 check and the escrow agreement to his office. He took them to the Governor who phoned Mrs. Eisiminger, advising her he understood some crooks had obtained some money from her on the parole he issued her husband and was willing to assist her in any way he could to recover the money. The Governor made an appointment with her for 10 the next morning. He asked him for his opin-

ion as to whether he should revoke the first parole or issue a new one and he advised the Governor, "If it were me and having acted in good faith the first time on the record, I wouldn't deprive the prisoner of the parole because somebody had got to his wife for some money." The Governor requested him to return the next morning for the conference with Mrs. Eisiminger, which he did, but Mrs. Eisiminger didn't come.

Leon C. Phillips testified in substance that during the period involving the Eisiminger transaction defendant held the position of chief investigator out of the office of Governor, to which he as Governor had appointed him. After Judge Minton resigned as Pardon and Parole Attorney, the defendant, as a part of his duties, worked out of the office of the Pardon and Parole Attorney, using both an office adjacent to the Governor's and the office of the Pardon and Parole Attorney. The first he knew of any pay-off in connection with the Eisiminger parole was subsequent to the issuance of the first parole when McNally came to his office and accused him of getting $5,000 of the money. Later in the day Sandy Singleton showed him a carbon copy of the escrow agreement, after which he called Mrs. Eisiminger, requesting her to come to his office, and the parties made an appointment for 10 the next day, but that Mrs. Eisiminger didn't ever come to his office. The witness denied he had any conversations with Fred Lowe concerning the Eisiminger matter in any of its stages, stated he received no money for issuing the paroles and knew nothing of any agreement concerning the pay-off until after the issuance of the first parole. His reason for issuing the second parole was because he felt Eisiminger was entitled to it; also that he would be transferred to the federal penitentiary and should be

given an opportunity to accept the parole if he were not involved in the deal. His information was that Eisiminger had not been given an opportunity to accept the first parole. That he gave instructions that defendant and Mrs. Eisiminger's attorney should take the second parole to Eisiminger and give him the opportunity of accepting or rejecting it.

Robert R. Fitzgerald, the defendant, testified that about three months before the first parole was issued, he had occasion to be at the State Penitentiary and, suffering pain in his back and shoulders, at some one's suggestion had Eisiminger give him a treatment. Two days later he had a second treatment and during this Eisiminger told him he was innocent of the crime of murder and had an affidavit from the girl's mother to that effect. He advised Eisiminger to send it to him and he would take the matter up with the Governor. Later he found the petition for federal clemency, with the affidavits attached, in his receiving basket in the office of the Pardon and Parole Attorney. He gave it to Mrs. Page to read, asked her opinion and was advised by her that there was some merit in the case. He had no knowledge that Lowe was interested in the case until he inquired whether Mr. Morris had written a letter in regard to it. He delivered the first parole to Lowe because Mrs. Eisiminger had called him, requesting that he do so. His recommendation that the parole be issued was on the basis of the affidavit of the girl's mother. Defendant denied any conversation with Mr. Day to the effect that the Governor would grant a pardon prior to the expiration of his term, or that he so advised Eisiminger. Defendant further denied having accepted any money in connection with the Eisiminger transaction or in connection with any other clemency matter.

Lewis Morris testified that while county attorney he had a conversation with the Governor concerning the Eisiminger transaction. The Governor advised him a bunch of crooks had taken some money off of Mrs. Eisiminger and asked him to investigate it.

During the course of the trial the court admitted testimony and evidence relating to other acts of bribery and solicitations of bribes on the part of defendant not included in the information, a great part of the record of approximately two thousand pages being devoted to the testimony of state witnesses offered to establish such other offenses and the testimony of witnesses for defendant denying the same.

These may be summarized as follows:

Carl Pruitt, serving a sentence for larceny of livestock, testified to a series of payments he made to defendant to procure executive clemency. This witness testified that in the spring of 1939, while at the Granite Penitentiary, he paid defendant $75. In September, 1939, he paid the defendant $150 at Woodward, Oklahoma, but Governor Phillips snatched it from defendant's hand. In July, 1940, he paid $550 to defendant at a farmhouse near the Granite Penitentiary and in the fall of 1941 he paid Fitzgerald $140 at Ardmore, Oklahoma.

Bess P. Vernon testified that on September 12, 1942, she gave the defendant a check for $250, redeemed by cash September 26, 1942, for procuring a leave of absence and a subsequent parole for Archie Horn, under sentence in the State Penitentiary for robbery with firearms.

Phil Kennamer testified that in the early spring of 1942, while he was serving a term of 25 years for murder in the State Penitentiary at McAlester, defendant sug-

gested that he raise five or ten thousand to secure his release.

Jim Wilkerson testified that in 1942, in a phone conversation with defendant, he inquired what it would take in order to procure clemency for his brother, then serving a life sentence for murder in the State Penitentiary at McAlester, and was advised by him it would take six or eight thousand dollars. The defendant advised him there would be some one out to see him and a day or two later an individual, whose identity he did not know, called at his home to discuss the matter.

The defendant objected to the admission of the above-mentioned transactions, with the exception of the one at Woodward, Okla., involving the witness Pruitt, which was elicited from Pruitt by defendant on cross-examination, and urges that the admission of such other offenses in evidence constitutes reversible error.

(1) The general rule as to admissibility of other offenses against one charged with crime is stated in the case of State v. Rule, 11 Okla. Cr. 237, 144 P. 807, as follows:

"As a general rule, evidence of other offenses, though of the same nature, is not admissible for the purpose of showing that the defendant is guilty of the particular offense charged. To this rule, however, there are well-settled exceptions. Those applicable to the question presented on the record in this case are as follows:

"(a) Evidence of other offenses similar to that charged is relevant and admissible, when it tends to prove some element of the one charged, as when it shows or tends to show guilty knowledge or intent in the commission of the offense charged.

"(b) Evidence that tends directly to prove the defendant's guilt is not rendered inadmissible because it

proves or tends to prove him guilty of another and distinct offense.

"(c) Evidence of a different offense from the one charged is admissible when both offenses are so closely linked or connected as to form a part of the res gestae.

"(d) Evidence of other offenses is competent to prove the specific offense charged when it tends to establish a systematic scheme or plan embracing the commission of two or more offenses so related to each other that proof of one tends to establish the other, or to connect the defendant with the commission of the offense charged."

The difficulty concerning this type of evidence does not lie in the understanding of the rule, but in the application thereof. Concerning the rule it has been said "* * * the courts are not divided on the abstract rules, but are in hopeless confusion in their application to particular facts." 22 C. J. S., Criminal Law, § 682. It further appears that in the application of the exceptions to the rule greater latitude is allowed in the admissibility of this class of evidence in some types of crimes which by their peculiar nature involve the question of intent, guilty knowledge and scheme and plan such as embezzlement, Sawyer v. State, 73 Okla. Cr. 186, 195, 119 P. 2d 256; false pretenses, State v. Rule, supra; abortion, Thacker v. State, 55 Okla. Cr. 161, 26 P. 2d 770; and bribery, Bond v. State, 9 Okla. Cr. 696, 129 P. 666; Spivey v. State, 69 Okla. Cr. 397, 104 P. 2d 263; Wilkins v. State, 70 Okla. Cr. 1, 104 P. 2d 289, and more restricted in such crimes as murder, Quinn v. State, 54 Okla. Cr. 179, 16 P. 2d 591; robbery, Koontz v. State, 10 Okla. Cr. 553, 139 P. 842, Ann. Cas. 1916A, 689; arson, Perdue v. State, 40 Okla. Cr. 9, 266 P. 514; however, as to all classes of crimes, the relevancy of the other offense to the one charged and the nearness or remoteness in time, are matters for consideration.

While there is authority to the effect that in a charge of bribery or conspiracy to bribe, evidence of other acts of bribery other than the one charged is inadmissible, People v. Glass, 158 Cal. 650, 112 P. 281; People v. Sharp, 107 N. Y. 427, 14 N. E. 319, 1 Am. St. Rep. 851; People v. Harvey, 235 N. Y. 282, 139 N. E. 268, 269; People v. Washburn, 104 Cal. App. 662, 286 P. 711, the greater weight of authority is to the effect that such evidence is admissible, Bond v. State, supra; Spivey v. State, supra; Taylor v. State, 174 Ga. 52, 162 S. E. 504; State v. Emory, 55 Idaho, 649, 46 P. 2d 67; State v. Schnettler, 181 Mo. 173, 79 S. W. 1123; Scott v. State, 107 Ohio St. 475, 141 N. E. 19; State v. Sweeney, 180 Minn. 450, 231 N. W. 225, 73 A. L. R. 380; Curtis v. State, 113 Ohio St. 187, 148 N. E. 834; Koenigstein v. State, 101 Neb. 229, 162 N. W. 879.

In the case of Bond v. State, supra, which involved a bribery charge, in the opinion it is said by this court [9 Okla. Cr. 696, 129 P. 667]:

"* * * Upon the trial of this cause the court admitted a great deal of testimony with reference to a number of different transactions upon the ground that they tended to show a conspiracy or general plan, of which the offense charged constituted a part and with which the defendant was connected, the purpose of which conspiracy being to corrupt officers, and secure immunity from prosecution for violations of the prohibitory and gambling laws of the state.

"* * * The state is necessarily confronted with great difficulty in establishing prosecutions of this kind, because conspiracies are always secret and are discovered with great difficulty. Therefore any evidence which tends to establish a conspiracy should be submitted to the jury. Conspiracies of this kind are necessarily proven largely by circumstantial evidence, and any circumstance should be admitted in evidence which in the slightest degree tends

to prove such conspiracy. In State v. Dulaney, 87 Ark. 17, 112 S. W. 158, 15 Ann. Case 192, the defendant was indicted for bribery. The state offered evidence of other similar offenses, but the court refused to admit the testimony, and the defendant was acquitted. The state appealed. In discussing this question the Supreme Court of Arkansas said : 'The principle of evidence that offenses or acts similar to the one charged may be competent for the purpose of showing knowledge, intent, or design is, as thoroughly established as the general proposition that other crimes or offenses cannot be shown in evidence against a defendant charged with a particular crime. While the principle is usually spoken of as being an exception to the general rule, yet, as a matter of fact, it is not an exception; for it is not proof of other crimes as crimes, but merely evidence of other acts which are from their nature competent as showing knowledge, intent, or design, although they may be crimes, which is admitted.

" '* * * Mr. Wigmore, in speaking of the admissibility of such evidence in charges of bribery, says: "On a charge of bribery, any of the three general principles—knowledge, intent, and design—may come into play. To show knowledge of the nature of the transaction, a former transaction of the court may serve, as indicating an understanding of the particular transaction. To show intent, another transaction of the sort may serve to negative good faith. To show a general design a former attempt towards the same general end may be significant." 1 Wigmore on Evidence, § 343. In the notes to this section may be found a review of the authorities; and it is found that they are not uniform in sustaining the principles announced by Mr. Wigmore, and he indulges in some caustic criticism of the courts that take views opposite to his statement of the correct principle. The best thought on the subject seems to be with Mr. Wigmore, and is found applied in the following bribery cases: Guthrie v. State, 16 Neb. 667, 21 N. W. 455; Higgins v. State, 157 Ind. 57, 60 N. E. 685; State v. Schnettler, 181 Mo. 173, 79 S. W. 1123. * * *) "

In the case of State v. Emory, supra, the defendant, a police officer, was indicted for receiving a bribe from one Rose Sage for protecting her in the illegal operation of her hotel. At his trial evidence of other acts of accepting bribes from other persons was received and in affirming the case the Supreme Court of the State of Idaho said [55 Idaho, 649, 46 P. 2d 69]:

"* * * Evidence of other offenses is admissible when such evidence tends directly to establish the particular crime; likewise, evidence of other like crimes is usually competent to prove the specific crime when it tends to establish motive, intent, the absence of mistake or accident, a common scheme or plan of embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others. * * * Any pertinent fact which throws light upon the subject under judicial consideration, the accused's guilt or innocence of the crime for which he is charged and on trial, is admissible; nor is such probative fact to be excluded merely because it may also prove or tend to prove that the accused has committed another crime. State v. Montgomery, supra [48 Idaho 760, 285 P. 467]. It was clearly established that appellant had asked for and received other bribes at times and from persons other than those charged in the indictment, under the same and like circumstances, and upon the same understanding or agreement as that had with Rose Sage. * * *"

The evidence of other offenses in this case was admitted by the trial court upon the theory the same tended to prove intent on the part of the defendant and to establish a common scheme or plan and by instructions to the jury limited the evidence to that purpose. Evidence of other offenses offered under this theory are inadmissible if distinct and unrelated or remote as to time. Nemecek v. State, 72 Okla. Cr. 195, 114 P. 2d 492, 135 A. L. R. 1149; Herren v. State, 75 Okla. Cr. 251, 130 P. 2d 325; Byer

v. State, 78 Okla. Cr. 267, 147 P. 2d 185. Defendant, in his brief, strenuously urge that the other offenses admitted in evidence in this case are too remote as to time specifically that involving the Carl Pruitt transactions. We are convinced that as a general matter of law evidence of bribes other than that with which a defendant is charged is admissible; however, the degree of remoteness of the other offenses involved in this case poses a more serious question. The evidence of the state indicates that defendant's participation in the conspiracy alleged started in December, 1941, and terminated on February 27, 1942, with the issuance of the last parole. The Vernon transaction was approximately seven months, and the Wilkerson transaction ten months, subsequent to the termination of the conspiracy. The Kennamer transaction, occurring in the spring of 1942, was close to the existence of the conspiracy. The Pruitt transaction, involving a series of payments, the first in the spring of 1939, almost three years prior, and the last in the fall of 1941, a few months prior, to the inception of the conspiracy.

In most of the cases involving bribery cited above, the time element does not appear; however, in the case of State v. Sweeney, supra, defendant, a Minneapolis alderman, was charged with having accepted a bribe in March of 1927. Evidence was admitted showing that on seven different occasions, ranging from December, 1925, to August, 1928, defendant accepted bribes from that many different sources. The Supreme Court of Minnesota affirmed the case, holding the evidence admissible as showing a common scheme or plan and stating [180 Minn. 450, 231 N. W. 228]:

"* * * All these transactions were corrupt and were for the purpose of corruptly obtaining money through the abuse of a public trust. This was the common aim.

Evidence of such other crimes is admissible, not to establish the other crimes, but as confirmation of the evidence tending to convict defendant of the crime for which he is on trial. * * *"

In the case of Taylor v. State, supra, the defendant, a clerk of council of the city of Atlanta, was charged with having accepted a bribe on October 13, 1925, to influence him in his official behavior. The trial court admitted evidence of other bribes accepted from other parties in the years 1923, 1924 and 1929. The Supreme Court of Georgia in affirming the conviction states [174 Ga. 52, 162 S. E. 511]:

"* * * Besides the objection above stated, this testimony was objected to upon the ground that it related to other transactions of which the defendant had been acquitted; that the same showed distinct and different alleged offenses; that the law, on the trial of one charged with a crime, did not allow evidence of alleged distinct and independent crimes to be admitted against him; and that there was such a difference between the transactions testified to by the witnesses and the case on trial, both as to time and nature, that there could be no connection between them. The court did not err in admitting this evidence. While it related to other offenses than that for which the defendant was on trial, it was relevant as tending to show intent, and system and to illustrate the methods and conduct of the defendant in reference to the particular acts of bribery for which he was on trial.

"* * * In State v. Davis, 90 Ohio St. 100 (2), 106 N. E. 770, cited by Corpus Juris in a note to the foregoing, it is said: 'in proving such corrupt intent, other similar offenses, tending to show the corrupt course of dealing of a public official may be shown as tending to prove the specific corrupt intent charged in the indictment.' * * *"

In the case of Spivey v. State, supra, defendant, a member of the Board of Education of Oklahoma City, was

charged with having accepted a bribe September 17, 1936, for voting to accept a certain bid for oil and gas royalty owned by the school district. The trial court admitted in evidence two agreements to accept bribes in April, 1937, which were not consummated, and the acceptance of a bribe November 15, 1937, from other parties for his influence in the purchase by the school district of certain land. This court, in an opinion by Judge Doyle, affirmed the conviction, the twelfth syllabus of the court reading as follows [69 Okla. Cr. 397, 104 P. 2d 264]:

"In prosecution of a public officer for receiving a bribe, evidence of receipt of bribes on occasions, other than that charged, is admissible as a part of a general scheme to obtain money corruptly through the abuse of a public trust."

Underhill states the rule as follows:

"To this general rule there are several distinct exceptions which have been permitted from absolute necessity to aid in the detection and punishment of crime. These exceptions ought to be carefully limited and guarded by the courts and their number should not be increased, but it must be admitted that the modern tendency on the part of the courts is to be liberal in the admission of evidence of collateral crimes." Underhill's Criminal Evidence, 4th Ed. Sec. 181, p. 318.

"Another exception to the general rule is that evidence of other crimes of the same general character when it tends to prove plan, system, habit or scheme of related offenses, or a design to commit a series of like crimes. This exception has been applied to many and varied cases of offenses such as * * * embezzlement, bribery and conspiracy. Unrelated crimes which were barred by the Statute of Limitations may be introduced to show general plan, and prior crimes committed three years before are not too remote. (Citing Lemday v. State, 50 Okla. Cr. 431, 298 P. 1054, an embezzlement case) Similar offenses subsequent to the crime charged are admissible to show sys-

tem, as well as prior crimes." Underhill's Criminal Evidence, 4th Ed., Sec., 187, p: 344.

The charge upon which defendant was convicted was conspiracy, rather than that of bribery. It appears that the charge of conspiracy is singular in the latitude allowed in the admission in evidence of offenses other than the one charged. Corpus Juris Secundum states the rule as follows:

"In prosecutions for conspiracy, while the general rule excluding evidence of other offenses is applied, wide latitude is allowed, provided the other offenses are logically connected with that charged; and evidence of like acts or collateral facts which are otherwise admissible in evidence as tending to prove the conspiracy charged, or an element thereof, is not to be excluded because it tends to show another offense." 22 C. J. S., Criminal Law, § 691.

Under the above section the following is cited from the case of Nelson v. State, 51 Ga. App. 207, 180 S. E. 16:

"Conspiracy * * * affords a signal illustration of the exception to the fundamental rule as to evidence of collateral offenses."

While this court has many times considered the question of other offenses in connection with various types of crimes where the evidence tended to establish a conspiracy, we have not found, nor have we been cited in the briefs, a case from this court wherein the question of admissibility of other offenses than that charged has been considered in connection with the charge of conspiracy; however, cases from other jurisdictions are Webster v. State, 206 Ind. 431, 190 N. E. 52; State v. Horton, 47 R. I. 341, 133 A. 236; People v. Shearer, 83 Cal. App. 321, 256 P. 611, which sustain the general rule as set forth in Corpus Juris Secundum, supra.

From the above authorities, and particularly the case of Spivey v. State, supra, we are of the opinion that the

evidence of other offenses under consideration was admissible. The only one which could be questioned is that involving the witness Carl Pruitt. Had his testimony been confined to the two transactions occurring in 1939, there would be serious doubt as to the admissibility of his testimony; however, according to the testimony of this witness he made a series of payments, those being, in addition to the one in the spring of 1939, one in September, 1939, another in July, 1940, and a fourth in the fall of 1941, which was a short time before the inception of the present alleged conspiracy. Each of these purportedly were for a single purpose— to obtain clemency for a particular crime, were therefore related, continuous in nature and while originating in the spring of 1939, extended to a short time prior to the inception of the conspiracy.

(2) Defendant argues, as proposition two, that McNally, Strong, Lowe and Marie Eisiminger were accomplices and defendant cannot be convicted upon their uncorroborated testimony. This assignment presents a question of mixed fact and law. Title 22 O. S. A. § 742 provides as follows:

"A conviction cannot be had upon the testimony of an accomplice unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely show the commission of the offense or the circumstances thereof."

This law has been applied by this court in countless decisions. It has also held that corroboration testimony may be circumstantial, rather than direct, Robinson v. State, 67 Okla. Cr. 8, 92 P. 2d 1082.

The only direct evidence in the record that defendant actually received a part of the money paid by Mrs. Eisi-

minger is the testimony of Lowe, an admitted accomplice, but there are circumstances which the state contends are corroborative of Lowe's testimony. These are as follows: On the same date the escrow agreement was entered into, defendant suggested to Mrs. Page that she write Lewis Morris, the county attorney who handled the state prosecution against Eisiminger, for his opinion in the matter. That Lowe was at the office of the Pardon and Parole Attorney several times in connection with the question of clemency for Eisiminger. The second letter to Morris was at the joint request of Lowe and defendant. Defendant recommended the parole. A parole was actually issued to Eisiminger. The first parole was delivered to Lowe, rather than being sent to the warden of the penitentiary. The second parole was taken directly to Eisiminger.

Circumstances sufficient to furnish corroboration for the testimony of an accomplice must be inconsistent with defendant's innocence, Jolliffee v. State, 21 Okla. Cr. 278, 298, 207 P. 454. The evidence indicated that it was customary when an application for clemency was made for the office of the Pardon and Parole Attorney to write the county attorney who prosecuted the applicant for his opinion in the case. It also appeared from the evidence that while it was the custom upon the issuance of a parole for it to be sent to the warden of the penitentiary, in a number of other instances the parole had been delivered to other parties for transmittal to the applicant. According to defendant the reason a second parole was taken to Eisiminger for acceptance was due to the Governor's request and their understanding that Eisiminger had not been given an opportunity to accept the first parole. The most significant of these circumstances is that the first letter was not written to Morris until the day

the escrow agreement was executed, although it appears that several days before that time defendant had given Mrs. Page the application for federal clemency, requesting she examine it and advise defendant of her opinion. Mrs. Page also joined in the recommendation, according to her testimony, at the suggestion of the Governor when he found the application incomplete and no witness in the case sought to impugn the integrity of Mrs. Page. Most of the circumstances above detailed are consistent with the defendant's innocence, and others, standing alone, may be sufficient to arouse a suspicion, but suspicion alone is insufficient, Jolliffee v. State, supra. They must be sufficient to tend to connect the defendant with the commission of the offense, McKinney v. State, 20 Okla. Cr. 134, 201 P. 673.

In our opinion the record discloses corroborative evidence other than the circumstances above mentioned. Dr. J. W. Eisiminger testified the defendant, when he brought the second parole to him, insisted that he accept the parole, promising him if he would that if it interfered with federal clemency, he would see that the Governor issued a pardon, defendant stating, "Now I am the Governor's agent. Any agreement I make with you the Governor is duty bound to carry out," and that the attorney who accompanied defendant stated: "Doc, you help us and we will help you. We have friends in Washington." Eisiminger then inquired: "Mr. Fitzgerald, will it help you if I accept this parole?" and defendant replied, "Yes, we could get things straightened out." Eisiminger then stated: "It is understood that if I accept this parole and it interferes with me getting a parole in Leavenworth, I am to have a pardon before the Governor leaves office?" to which defendant replied, "That is right. You ought to be home in about four months."

The question of the truth or falsity of this testimony was for the jury, rather than for this court. If true, no other reasonable inference can be drawn but that the defendant was culpably implicated in the transaction. In the case of Edson v. State, 77 Okla. Cr. 100, 139 P. 2d 198, 201, this court said:

"Where the sufficiency of the evidence to corroborate an accomplice is challenged, this court will take the strongest view of the corroborating testimony that such testimony will warrant, and, if it can say that there is corroborating evidence tending to connect the defendant with the commission of the offense, it will uphold the verdict."

Considering the circumstances above related in connection with the testimony of Eisiminger, and in view of the rule stated in Edson v. State, supra, this court is of the opinion that the testimony of the admitted accomplices in the case was sufficiently corroborated to tend to connect the defendant with the commission of the offense charged.

(3) The defendant next urges the trial court committed fundamental and prejudicial error in refusing to give defendant's requested instruction No. 3 defining the term "accomplice" to the jury, contending that while the court advised the jury that Mrs. Eisiminger, Lowe, McNally and Strong were accomplices as a matter of law, the evidence concerning other state's witnesses, including Dr. J. W. Eisiminger, was such that the jury could have likewise found them to be accomplices whose testimony would have to be corroborated. Defendant further insists that the failure of the court to define the term, so that the jury could have considered the definition in connection with these other witnesses, left the jury without any standard whereby it might properly evaluate the testimony of these witnesses.

The record discloses that by instruction No. 27 the trial court properly instructed the jury that the witnesses Marie Eisiminger, Strong, Lowe and McNally were accomplices as a matter of law whose testimony required corroboration. In instruction No. 29 the court advised the jury in connection with other offenses that the witnesses Carl Pruitt and Bess Vernon were accomplices as a matter of law in regard to the alleged other offenses in which they participated, and submitted to the jury the question of whether or not Leonard Woodruff and Archie Horn were accomplices in connection with those offenses in which they were alleged to have participated, and defined the term "accomplice" in connection with those witnesses. This instruction reads as follows:

"In regard to the testimony concerning other offenses, which according to other instructions given you herein, have been admitted only for the limited purposes set forth in the said other instructions, you are instructed that before the said evidence of other offenses can be given any credence, for the limited purposes as otherwise mentioned in these instructions, you must find that as to the accomplices in the said other offenses that their testimony has been corroborated as required in the instruction just given you, and in this connection you are instructed that the witnesses Carl Pruitt, and Mrs. Bess Vernon, are what is termed in law accomplices to the said other offenses as to which said witnesses testified. The witnesses, Leonard Woodruff and Archie Horn, may or may not have been accomplices to such other offenses, and whether or not they are accomplices is a matter for you to determine. In making such determination you may consider that an accomplice is one who with criminal intent is concerned with others in the commission of a crime, either by being present and participating in it, or not being present by aiding and abetting it or by having advised and encouraged its commission, though not present when it is committed."

It should be observed that by instructions 27 and 29 the court in effect informed the jury that only the witnesses named therein could have been accomplices whose testimony was required to be corroborated. In no other instruction was the jury authorized to consider the accomplicity of any other of the state's witnesses. The Attorney General, in his brief, argues that the last paragraph of instruction 29, set out above, correctly defines an accomplice witness, and it was therefore not error for the trial court to refuse to give defendant's requested instruction re-stating the same rule. This argument is untenable because, while the court did make a correct statement of law defining an accomplice, the investigation of the jury on this question was expressly limited to a consideration of the possible accomplicity of the witnesses Woodruff and Horn. If there are other witnesses who, under the record, are possible accomplices, the vice of this charge is apparent. If the testimony of any witnesses for the state, other than those named by the court, was tainted with accomplicity, then under the court's instructions the jury was at liberty to consider such witness' testimony as corroboration of those designated by the court as accomplices or possible accomplices which would result in one accomplice corroborating another accomplice which is contrary to law, Capps v. State, 60 Okla. Cr. 337, 44 P. 2d 151.

In cases involving the question of testimony of accomplices there is often involved two types of witnesses. First, those whose acts and conduct are admitted, or undisputed, and who are considered as accomplices as a matter of law. Second, those concerning whom the evidence is conflicting as to their participation, or is susceptible of either interpretation, McKinney v. State, 20 Okla. Cr.

134, 201 P. 673; Hewett v. State, 38 Okla. Cr. 105, 259 P. 144. Concerning the first, it is the duty of the court to instruct the jury that the witness is in fact an accomplice and that it is necessary for the testimony of such a witness to be corroborated. In regard to the latter, the question is one of fact for the jury to be submitted under proper instructions, Hewett v. State, supra. It is with the last-mentioned class that this assignment of error is concerned.

The term "accomplice" has been defined by this court as one who could be indicted or informed against for the offense for which the accused is being tried, Jefferson v. State, 34 Okla. Cr. 56, 244 P. 460. While this is a true statement of law, this court has not confined the definition of an accomplice to this particular language. It has further defined the term accomplice as "all who participate," Spivey v. State supra [69 Okla. Cr. 397, 104 P. 2d 264]; "one who knowingly and voluntarily co-operates, or aids or assists" Comba v. State, 68 Okla. Cr. 373, 99 P. 2d 170, 172, or whose "participation * * * was criminally corrupt." Finley v. State, 84 Okla. Cr. 309, 181 P. 2d 849, 858. In the case of Yeargain v. State, 57 Okla. Cr. 136, 45 P. 2d 1113, 1118, Judge Doyle quotes with approval from the case of People v. Coffey, 161 Cal. 433, 119 P. 901, 39 L. R. A., N. S., 704 as follows:

"Mr. Justice Henshaw, considering what acts or facts fix this relationship or characteristic upon a witness, uses the following language:

" 'One is an accomplice in a crime because of the part that he has taken in it, not because he may be indicted as a principal. The latter is a mere accidental circumstance, depending upon the language of the statute, and in no way affecting the true touchstone, namely, the part which the accomplice has taken in the offense, The judicial declaration that, under a statute such as our section

31 of the Penal Code, all accomplices may be indicted as principals, is perfectly sound. But the attempted reasoning from this that if a person cannot be indicted as a principal, he is, therefore, not an accomplice, is absolutely fallacious. * * *

" 'At common law the accomplice could not be indicted for the same crime, yet he was none the less an accomplice. The declaration that one is an accomplice if he can be indicted for the same crime charged against the defendant on trial is perfectly sound; but the converse of the declaration, namely, that, if he cannot be indicted for the same crime, he is not an accomplice, is the merest sophistry, which, ignoring the true test and meaning of the word, seeks to turn shadow into substance. That test and meaning, as we have said, are expressed in section 31 of the Penal Code. If a man has committed a crime, if he has aided and abetted in its commission, if he has advised or encouraged its commission, he is an accomplice with all other participes criminis.' "

In the recent case of Finley v. State, supra, in an opinion by Judge Brett, it is stated:

"The true test of whether Ruth Fugatt was an accomplice is whether she could be charged and punished for the crime with which the defendant is charged, or whether her participation in the offense was criminally corrupt. 16 C. J., 671, note 71 and 72, 22 C. J. S., Criminal Law, § 786; Mayes v. State, 11 Okla. Cr. 61, 142 P. 1049; People v. Coffey, 161 Cal. 433, 119 P. 901, 39 L. R. A., N. S., 704."

One of the witnesses for the state whom defendant contends is either an accomplice or a possible accomplice, according to the evidence in the case, is J. W. Eisiminger, whose participation must be examined in the light of the above pronounced principles. There is no proof that Eisiminger was an original conspirator but that is immaterial if he subsequently concurred in the plans and aided in the execution. The general rule appears at 12 C. J., Sec. 88, page 579 as follows:

"While to authorize a conviction of several persons charged in one indictment with conspiracy each must be proved to have come into the conspiracy prior to the consummation of the act to be done in pursuance thereof, it is not essential to a conviction of a person or persons charged with a conspiracy, that he or they should have originated the conspiracy. All who accede to a conspiracy after its formation and while it is in execution, and all who with a knowledge of the facts concur in the plans originally formed and aid in executing them are fellow conspirators. They commit an offense when they become parties to the transaction or further the original plan. A person coming into a conspiracy after its formation is deemed in law a party to all acts done by any of the other parties, either before or after, in furtherance of the common design." 15 C. J. S., Conspiracy, § 75.

As far as the record shows the first information Eisiminger had concerning proposed state clemency was when his wife brought him the first parole for acceptance. According to Eisiminger's testimony relative to this meeting he read the parole, was advised by his wife she had been promised a pardon and was going back and make these parties that promised her a pardon make good on their agreement. Following this he discussed with an attorney employed by Strong, and sent to the penitentiary to interview him, the difference between a pardon and a parole as affecting his chances for federal clemency. Thereafter, and when the second parole was submitted to him, he engaged in a conversation with defendant and the attorney employed by his wife. Again he was hesitant to accept a parole and insisted on calling his wife. According to his testimony, it was only when he was advised that his acceptance of the parole would help the defendant and was in consideration of his acceptance, assured he would receive a pardon prior to the termination of the Governor's term in office, did he sign and accept the pa-

role. His attitude was one that he knew a large sum of money had been paid by his wife in his behalf for a pardon and was not to be easily persuaded to take less than that for which she had bargained. The jury would have been justified in concluding from this testimony that Eisiminger had been fully informed that a pay off to Strong had been made. Otherwise why would Eisiminger refuse a parole and permit his wife to demand a pardon? According to the testimony of one prison official he had never heard of but one instance of a prisoner refusing a parole. The obvious inference of this testimony is that Eisiminger had been advised by his wife of the true facts in the matter when she brought the first parole to him. These facts and circumstances could have well indicated to the jury that Eisiminger knew of the tainted source of the paroles, for according to his own testimony he was willing to, and did, assist defendant by accepting the parole in consideration of the promise of a pardon to be granted him at a later date. A reasonable inference would be that Eisiminger was culpably implicated in the transaction prior to the termination of the conspiracy and knowingly aided and abetted in the furtherance of its object. Conversely, the jury might have concluded that Eisiminger had no way of restraining his wife from her announced purpose of making those parties that promised her a pardon make good on their agreement, and did not encourage her in this effort, nor believe the defendant or the Governor criminally involved with the pay off.

In regard to a situation thus presented, this court stated in the case of Hewett v. State, supra [38 Okla. Cr. 105, 259 P. 146] the following rule:

"Where the facts are undisputed or admitted, the question whether or not the witness is an accomplice is generally one of law for the court, but where the evidence

is conflicting as to whether or not the witness participated in the commission of the offense, whether or not the witness is an accomplice is a question of fact to be submitted to the jury under proper instructions. * * *

"In the record before us the defendant was entitled to have submitted to the jury by proper instruction the question whether or not Forster was an accomplice, and the further instruction that if found to be an accomplice a conviction could not be had on his testimony unless corroborated."

In the case of Cudjoe v. State, 12 Okla. Cr. 246, 154 P. 500, 501, L. R. A. 1916F, 1251, the rule is stated as follows:

"When the question of an accomplice arises in the trial of a case, the general and accepted rule is for the court to instruct the jury on the law of accomplice testimony and leave the question as to whether or not the witness is an accomplice for the determination of the jury as a question of fact. But where the facts are not in dispute, or where the acts and conduct of the witness are admitted, it becomes a question of law for the court to say whether or not those acts and facts make the witness an accomplice." See also, McKinney v. State, supra; Logan v. State, 23 Okla. Cr. 316, 214 P. 944; Wiley v. State, 17 Okla. Cr. 643, 191 P. 1057.

In view of these authorities it must be admitted that defendant was entitled to an instruction which would submit to the jury the question of Eisiminger's accomplicity. Instruction No. 3 requested by defendant properly defines the term accomplice, Yeargain v. State, supra. Had this instruction been given by the court, the jury, with other instructions given, could have applied this test to Eisiminger, as well as to certain other witnesses. The instructions as given by the court had the effect of precluding the jury's consideration of the accomplicity of any of the state's witnesses other than those named by the court. As here-

inbefore noted, should Eisiminger's testimony be excluded, there is serious doubt that the record furnishes sufficient evidence to corroborate the testimony of accomplices so as to sustain the conviction. Should the jury have determined Eisiminger to be an accomplice, his testimony could not have been considered for the purpose of corroboration, for, as previously stated, one accomplice cannot corroborate another.

It cannot be contended that the court's refusal to submit defendant's requested instruction No. 3 is harmless error, Logan v. State, supra. The only witness who testified defendant accepted money in connection with the Eisiminger transaction was the witness Lowe who was at the time he testified under charge for his participation in the Eisiminger pay off. The only satisfactory corroboration of Lowe which tended to connect defendant with the crime charged was Eisiminger, a self-confessed perjurer and under conviction for perjury, conspiracy and murder. Where, as in this case, the corroboration of the testimony of the admitted accomplices is the pivotal issue of fact, and, as heretofore pointed out, the only satisfactory testimony tending to connect the defendant with the commission of the offense, is that of a witness of questionable credibility, whose testimony is of doubtful probative value, and is a possible accomplice, we think, even though the defendant had failed to request it, the court should have, on its own motion, instructed on that issue, Lockhart v. State, 29 Okla. Cr. 154, 232 P. 857. The hazard to defendant's rights by failing to submit this issue was greatly increased when, by the instructions given, the jury was in effect advised that J. W. Eisiminger was not an accomplice and that his testimony could be considered for the purpose of corroboration.

408

The evidence is too conflicting and the state's case based too largely upon an unreliable type of witness for this court to conclude defendant's guilt so apparent as to render the error harmless. The witness Carl Pruitt had twice been convicted of felonies. The witness Kennamer had been convicted of manslaughter. The witness Bess Vernon was an accomplice to an alleged other offense and subject to prosecution as such. Archie Horn had been convicted of a felony. The witness Leonard Woodruff was a possible accomplice to one of the alleged other offenses. This type of testimony must be received with caution. The purpose of the statute providing that no person shall be convicted of a crime on the testimony of an accomplice, without corroboration, is to prevent one guilty of a crime from implicating another falsely, for hope of clemency, motives for revenge or for any other reason, Comba v. State, 68 Okla. Cr. 373, 99 P. 2d 170. The verdict of the jury appears to reflect uncertainty. The punishment imposed was a fine of $500, the exact amount defendant allegedly received from Lowe. If defendant is guilty as charged, it represents a reprehensible breach of a public trust for which the maximum punishment of two years in the penitentiary and a fine of $10,000 would be fully deserved but, guilty or innocent, under the law of this state a defendant is entitled to a fair trial, Herren v. State, 75 Okla. Cr. 251, 130 P. 2d 325. We must conclude the trial court erred in refusing to submit to the jury instruction No. 3 requested by the defendant, for, as stated by this court in the case of Woodruff v. State, 74 Okla. Cr. 289, 125 P. 2d 211:

"The policy of the law is that all persons shall have a fair and impartial trial, and it cannot be said that a 'fair and impartial trial' has been had unless the jury has been properly instructed as to the law of the case, and

hence judgment of conviction must be set aside if the instructions did not fully present to the jury all the material issues involved."

For the reasons given the case is reversed and remanded with instructions to grant defendant a new trial.

McLAURY and JONES, Special JJ., concur.

BERT B. BAREFOOT, P. J., of the Southern District, Judge DICK JONES of the eastern District, and Judge JOHN A. BRETT of the Northern District, having each certified his disqualification in the above case, the Honorable FINLEY McLAURY of Snyder, a member of the Kiowa County Bar; the Honorable LAWRENCE JONES of Bristow, a member of the Creek County Bar; and Honorable GUY L. HORTON Stillwater, of the Payne County Bar, were appointed by the Governor as special judges in their respective districts in the above-entitled case.