## HUNTER v. STATE.

No. A-11840. Nov. 10, 1953.

Rehearing Denied Dec. 30, 1953.

(264 P. 2d 997.)

Sam J. Goodwin and C. H. Bowie, Pauls Valley, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Fred Hansen, First Asst. Atty. Gen., for defendant in error.

JONES, J. The defendant, Clark Hunter, was charged by an information filed in the district court of Garvin county with the crime of obtaining money by means and use of a false and bogus check, to wit $768.17, from one O. G. Hall; was tried, convicted, and pursuant to the verdict of the jury was sentenced to serve a term of one year and one day in the State Penitentiary and to pay a fine of $500, and has appealed.

Two assignments of error are presented in defendant's brief. First, there was a fatal variance between the allegations of the information and the proof of the state, and the trial court accordingly erred in not instructing the jury to return a verdict of not guilty on account of such variance. Second, the trial court committed error in admitting hearsay evidence over the objection of the accused.

The evidence of the state, briefly stated, shows that on February 26, 1947, the defendant went to the Wynnewood livestock sales barn where one O. G. Hall and R. L. Murphey conducted a weekly sale of livestock brought to the sales barn for auction. Owners of livestock would bring their livestock to Hall and Murphey and it would be sold by them to the highest bidder and Hall and Murphey received three per cent of the sales price as their commission for handling the sales. On February 26, 1947, the defendant appeared at the sales barn and was the highest bidder for two cows, six calves, seventeen hogs, and four horses, and the total amount of his bids was $768.17, for which the defendant gave a check on the First State Bank of Dodson, Texas, to the Wynnewood Livestock Sales Company. Hall and Murphey accepted the check and paid to the customers who brought the various heads of livestock sold to the defendant the amount bid by the defendant less their three per cent commission. In turn, Hall and Murphey sent the check through their bank for collection and payment was refused and a protest fee of $2 was charged to the endorsers. The check was sent through for collection a second time and again payment was refused by the bank on account of insufficient funds to the credit of the maker of the check to pay the same.

We were considerably impressed with the apparent substantial merit to the first assignment of error upon our first consideration of it, because unquestionably the defendant received certain heads of livestock which he purchased at the sales

ring, and the accused contends that since the information alleges that he received money in exchange for the bogus check, when in reality he received livestock, that there was a material variance between the allegations of the information and the proof.

In the case of McCoy v. State, 92 Okla. Cr. 412, 223 P. 2d 778, 780, this court stated:

"But what constitutes a variance in a criminal case sufficient to entitle an accused to a new trial? This court has held that a variance in a criminal case is an essential difference between the accusation and the proof, and that a variance is not material unless it is such as might mislead the defense, or expose the defendant to the injury of being put twice in jeopardy for the same offense. Tiger v. State, 54 Okla. Cr. 202, 16 P. 2d 889; Brashears v. State, 38 Okla. Cr. 175, 259 P. 665; Woods v. State, 22 Okla. Cr. 365, 366, 211 P. 519."

However, a closer study of the facts shows that the county attorney properly charged the accused with obtaining money by means of the bogus check. R. L. Murphey, copartner with Hall in the ownership of the Wynnewood livestock sales company, explained the procedure followed at the sales barn. Mr. Murphey testified:

"Q. The property supposed to have been paid for by that check, was that your property? A. It belonged to customers, customers who bring property there for sale, and when it is sold the purchasers pay for it to us, and we pay the customers. * * * Q. What is your source of income for selling this property? A. Three per cent. Q. Is that paid by the seller or the buyer? A. By the seller. Q. The property which was covered by this check was paid for by you and Mr. Hall, to the people who brought that stock in there, is that right? A. Yes, sir. Q. And you put the money in the bank to cover this check or did Mr. Hall do that? A. Mr. Hall actually did that."

Mr. Hall testified:

"Q. Let me ask you this question, the stock listed on the face of the check, did you and Mr. Murphey pay for the stock? A. Yes, sir, we did. Q. Who did you pay for the stock? A. The boys that brought the stock in to the sales barn, the consignees of the stock. Q. You mean the consignors? A. Yes, sir. Q. The cattle and horses and hogs were paid for by you and Mr. Murphey at the time the sale was over that day? A. Yes, sir, we collected our money after the sale was over and we paid for this stock. * * * Q. Who suffered the loss on the cattle and the hogs and the horses? A. Mr. Murphey and I have suffered the loss up to now, we paid for the stock, we had to take up that check. Q. And you were the sole owner of the Wynnewood Livestock Sales Barn? A. That is right. Q. Has there ever been any correspondence between the defendant and yourself regarding this matter? A. I never saw him until today. Q. And that check was given you on what day? A. February 26, 1947. Q. Have you or did you attempt to locate him before that time, that is before this time and after the check was given? A. Yes, sir. Q. Was he ever located? A. Probably a year and a half later we heard of him in Oklahoma City, and then some place in Kansas, I forget the name of the town."

From this evidence it is apparent that the defendant made certain purchases of livestock through the agency of the Wynnewood Livestock Sales Company and gave a check to the Wynnewood Livestock Sales Company in order to obtain money from the company to pay the former owners of the livestock the amount that was bid on the livestock by the accused. When the bids were made and accepted by the auction company, the company became liable to their customers, who had brought their livestock to them for sale. The check given by the accused was made payable to the livestock sales company. Hall and Murphey did not own the livestock purchased by the accused.

They were acting merely as agents, and when the check was made payable to them, they accepted the check and put up their own money in reliance upon the defendant's check. In actuality, the defendant received for his check given to the Wynnewood Livestock Commission Company, money to pay the amounts bid by him to the respective former owners of the livestock. The information charged defendant obtained money from Hall by means of the check and the proof was in accordance with this allegation as Hall put up his individual money to take care of the check. The county attorney could not correctly allege that defendant obtained livestock from Hall as Hall did not own the livestock. He merely was an auctioneer who received a commission for auctioning the livestock. The case would be comparable to a person making purchases at a department store and then giving a check payable to an individual clerk for the amount of the purchase and the clerk then in turn delivering his own money to the store cashier to pay for the purchases. Although the maker of the check received merchandise he obtained money from the clerk by means of his check, which money was used to pay for the merchandise.

The second assignment of error is directed at certain testimony of the witness Teutsch and the witness Loftis. The witness Teutsch testified on behalf of the defendant that he was the vice-president of the First State Bank of Dodson, Texas, which was the bank upon which the check in question was drawn. Teutsch testified that the defendant had been a customer of his bank in past years and that his father, R. L. Hunter, carried a nice account with his bank. He testified that the defendant was engaged in purchasing livestock and would give checks drawn on the bank where the witness worked and that when the checks were presented for payment, the witness would contact the father of defendant to secure authority to pay the check out of the account of the father. He testified that when the check in question in the amount of $768.17 came to his bank for payment, that he went to the home of defendant's father to secure authority to pay the check out of the account of the father and the father refused to authorize payment of the check because the hogs purchased by the defendant at the sale had cholera and had died. The witness further testified that when he arrived at Mr. Hunter's house, that Mr. Hunter and the brother of defendant were burning some hogs which had allegedly died from the cholera. On cross-examination, the witness testified without objection that along about the time the check in question was given that he had occasion to turn down other checks, and one of these checks was payable to a livestock commission house at Ada, Oklahoma.

The witness Loftis testified for the state as a rebuttal witness. He operated the livestock sales company in Pauls Valley, and he testified that on February 27, 1947, defendant purchased some cattle, horses, and some hogs at the auction sale conducted by the witness; that the check given for payment was returned to him and the reason stamped on the check for nonpayment was on account of "insufficient funds." That he had the check re-run through his bank for collection but payment was again refused. That he made a trip to Dodson, Texas, to try to collect the check, but defendant's father refused to help on the check, but they did return some of the cows and calves which had been purchased from him and the check was later paid.

Some of the testimony of both Teutsch and Loftis was hearsay, but it was given without objection from defendant's counsel. Furthermore, in view of their competent evidence, we do not attach any importance to the small amount of hearsay evidence which was included in their testimony. Both of these witnesses turned out to be favorable to the accused. Teutsch, of course, was acquainted with the family of the defendant and went as far as he honestly could to make a good witness for him. The witness Loftis was permitted to testify on cross-examination as to statements made to him by the relatives of the accused when he

had gone to Dodson, Texas, that a large number of hogs purchased by the accused were sick with cholera at the time they were brought, and he further testified that he saw them burning hogs which allegedly had died from the cholera. This evidence was improper cross-examination, but the trial court permitted it and it corroborated the evidence of the accused that he had not paid the check given to the Wynnewood Livestock Sales Company for the reason that the hogs he purchased were sick with the cholera, and that the other animals he purchased, including the horses and cattle, were likewise not in the condition in which they had been represented at the time of the sale, and that for all those reasons, he refused payment of the check. This hearsay evidence was favorable to the accused and he may not complain.

We have examined the instructions which were given by the trial court, and they correctly covered all of the issues presented by the evidence. It is our conclusion that the defendant received a fair trial in substantial compliance with the law provided for such cases and that the judgment and sentence of the district court of Garvin county should be affirmed.

It is so ordered.

POWELL, P. J., and BRETT, J., concur.