**J. W. HARDESTY, Plaintiff In Error,**

v.

**The STATE of Oklahoma, Defendant In Error.**

**No. A-12123.**

Criminal Court of Appeals of Oklahoma.

Nov. 23, 1955.

W. C. Henneberry, Holly L. Anderson, Tulsa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

BRETT, Judge.

Plaintiff in error, J. W. Hardesty, defendant below, was charged by indictment on November 3rd, 1953, in the District Court of Tulsa County, Oklahoma, for the crime of conspiracy to commit offenses against the State of Oklahoma, 21 O.S. 1951 §§ 421 and 424, to-wit: to cheat and defraud the State of Oklahoma, by doing acts defined as unlawful, under the provisions of 21 O.S.1951 §§ 341 and 343, to which should have been added in the indictment, 62 O.S.1951 § 303, and 69 O.S. 1951 §§ 324 and 327, prohibiting and penalizing County Commissioners direct, or indirect, interest in any contract for construction, or improvement, of roads, etc. The conspiracy was allegedly entered into on or about the 15th day of July, 1949, by and between J. W. Hardesty, defendant, County Commissioner of Tulsa County, District No. 1, John L. Baker, and Mrs. John L. Baker, doing business as Baker Auto Salvage and/or Baker Transport Company, and one Dale Bryson, successor to the Bakers in the operations herein involved and, whom, it is alleged joined said conspiracy and adopted its objects and

purposes, and continued its operations with the defendant, Hardesty. The defendant, Hardesty, was tried by a jury, and convicted; the jury being unable to agree on the punishment, the same was left to the trial court, who assessed a penalty of 18 months in the State Penitentiary, and a fine of $6,500. Judgment and sentence was entered accordingly, from which this appeal has been perfected.

The indictment alleges in substance, that the defendant J. W. Hardesty, was the duly elected, qualified, and acting County Commissioner for District No. 1, of Tulsa County, Oklahoma, from July, 1949, up to and including the return of the indictment, and as such County Commissioner, it was his duty to maintain and repair the County roads in Commissioner's District No. 1. It appears therein, that John L. Baker, and Mrs. John L. Baker, during the time herein in question, up to and including June 15, 1953, were doing business as the Baker Auto Salvage, and the Baker Transport Company, transporting and spreading road oil for hire. The indictment further alleges that the defendant, J. W. Hardesty, and John L. Baker, doing business as hereinbefore set forth, on or about July 15, 1949, entered into an agreement, whereby the Bakers would transport to the defendant, Hardesty's County Commissioner's District No. 1, road oil, and spread the same on the County Highways in said district for 2¢ per gallon. As a part and parcel of this agreement, the Bakers, in order to get the business, unlawfully agreed to kickback to Hardesty, the sum of ½¢ per gallon on all the road oil transported and spread on the highways in Commissioner's District No. 1, in Tulsa County, Oklahoma, by the Baker interests. It is further alleged in said indictment that the defendant, J. W. Hardesty, knowing of his personal profit in the operations, would vote his approval of the Bakers' claims for transporting and spreading said road oil in said County Commissioner's District No. 1, for the purpose of unjustly enriching himself, contrary to law. This unlawful agreement, it is alleged, was carried out by the Bakers until June, 1953, during which

time they made numerous unlawful payments according to said agreement, to the then County Commissioner, J. W. Hardesty. In June, 1953, the Bakers leased their business to Dale Bryson, retaining a 5% interest in the gross profits from the operations. In this connection, the indictment alleges that Bryson, named as coconspirator, agreed to continue the unlawful kickbacks to Hardesty, and pursuant to said unlawful agreement, Bryson did make certain payments to the defendant, J. W. Hardesty, and continued said agreement in effect up to July 21, 1953, the date of the last alleged overt act. The indictment alleges a total of 132 overt acts performed by the alleged conspirators in performance of the alleged conspiracy, its objects and purposes.

The defendant, complaining of the conviction, judgment and sentence, urges first, that the trial court erred in not sustaining the defendant's demurrer to the evidence because of the lack of corroboration of the accomplices' testimony. This contention necessarily requires a consideration of the State's evidence. The evidence of the State, in support of these charges, briefly as possible, and still as consistent with the necessities of clarity, is in substance as hereinafter set forth:

The State's proof shows that John L. Baker was a man who had suffered several paralytic strokes, and was unable to get around readily; therefore, he was compelled to rely on his wife and others for the actual operations connected with his business. It appears he sat in his office and gave directions from time to time. His office and place of operations was located at 48 North Peoria Street, in Tulsa, Oklahoma. Mr. Baker testified that he met J. W. Hardesty, at this address, through a man named E. E. Pope, an employee of defendant, Hardesty. Baker's testimony discloses that he had hauled oil for Mr. Pope when Pope was employed by the State. He related that shortly after Hardesty went into office in July of 1949, that Pope brought the defendant and him together, and the conspiracy herein alleged was entered into by and between Hardesty, Mrs. Baker, and himself, in the

presence of Pope, and Lloyd Barnes, an employee of the Bakers. He testified, in substance, that under the terms of this unlawful agreement, the Bakers were to haul road oil purchased by the County from the Mid-Continent Petroleum Corporation, in Tulsa. Baker was to deliver this oil and spread it on the roads in the County Commissioner's District No. 1, for 2¢ per gallon, with a ½¢ kickback to Hardesty. The payments for the road oil, as well as the hauling, were made to the Mid-Continent Petroleum Corporation. The Mid-Continent Petroleum Corporation would then make payment to the Bakers for the transportation, or freight charges, for hauling the oil. Occasionally payment for hauling the oil herein involved was made by the County, to the Bakers, but the State's evidence clearly shows, no matter who made payments to the Bakers, whether the County, or the Mid-Continent Petroleum Corporation, Hardesty was to get his kickback of one-fourth from the Bakers, or ½¢ per gallon. It is well to explain that the County paid for both the oil and the hauling, regardless of who paid the Bakers on the items hereinafter set forth.

The Bakers testified they did their banking business through the First National Bank and Trust Company, in Tulsa, but Mrs. Baker was the person who handled the money and wrote the checks. When the payments were received from the Mid-Continent Petroleum Corporation, Baker testified Mrs. Baker would obtain cash and place one-fourth of the transportation payment made to Baker by the Mid-Continent Petroleum Corporation, in an envelope and give it to the defendant, J. W. Hardesty. He testified he saw these transactions take place, which he thought occurred about once a month. Baker testified the unlawful agreement continued in operation between himself, Mrs. Baker, and Hardesty, until June 15, 1953, when they leased the business to Dale Bryson for $300 per month, and 5% of the gross profits. Bryson, Mrs. Baker related, adopted the conspiracy and continued it under his operations.

Mrs. Baker's testimony in regard to the formation of the conspiracy, and its operations, was substantially the same as that of her husband, but in addition thereto, she testified that she wrote most all of the checks herein involved, and obtained the cash on them at the Bank, which was later delivered to J. W. Hardesty by her, or her employees, Carl Meadors, or Lloyd Barnes, but if by the last two parties, the delivery was made in her presence. She testified she was not a bookkeeper, but that her bookkeepers were Mr. Carl Middaugh, and the aforesaid Barnes.

She further testified in relation to separate numerous transactions, evidenced by certain Exhibits, properly identified and admitted in evidence, reflecting the nature of the operations. It will not be necessary to enumerate all of these transactions, as to do so would unduly lengthen this opinion. Only characteristic specimen transactions will be set forth herein. They are as follows, to-wit:

Two certain billings; one bearing the date of September 22, 1949, covering a total of 29,452 gallons of oil hauled, at 2¢ per gallon, directed to the Mid-Continent Petroleum Corporation by the Bakers Auto Salvage, at a total price of $589.04, and another billing of the same nature on the date of September 12, 1949, covering 12,320 gallons, at 2¢ per gallon, or a total price of $246.40. She also identified ledger sheets which disclose the cash was received from the Mid-Continent Petroleum Corporation in the sum of $835.44, or the total of the two amounts, of $589.04, and $246.40, which sum of $835.44 she deposited in the Bank; and thereafter, on September 19, 1949, she drew a check for cash in the sum of $208.86, the same being check No. 3023. The said sum of $208.86 being one-fourth of $835.44. Check stub No. 3023 reflects the notation that this check was drawn to "Cash" for "J. H.". She testified that that notation signified that the cash was delivered to J. W. Hardesty in performance of the unlawful agreement. She further testified that this item of disbursement of $208.86 was carried on the Baker bookkeeping ledger un-

der the item of "Truck Income", in red pencil, which indicated to her, and the bookkeeper, that Hardesty got the money, as all of such disbursements to Hardesty appeared in the ledger. These checks, it appears, from time to time were presented to the Bank as cash items, without indorsement.

The next specimen transaction identified by Mrs. Baker was check No. 3084, together with the stub and the billing from the Baker Auto Salvage to the Mid-Continent Petroleum Corporation, covering three separate haulings of oil; one bearing date of October 6, 1949 in the amount of 18,986 gallons, with transportation charges at the rate of 2¢ per gallon, making a total due for transportation charges of $379.72; a second one bearing date of October 7, 1949, covering a total of 10,466 gallons of oil, at 2¢ per gallon, or a total sum of $209.32; and a third bearing date of October 7, 1949, covering transportation charges on 5,680 gallons of oil, at 2¢ per gallon, or a toal of $113.60, for which the Mid-Continent Petroleum Corporation issued its check of October 12th, 1949, for the total sum in payment of transportation, or freight charges, for $702.64. Mrs. Baker deposited the check covering the three several sums in the Bank and drew check No. 3084 on October 17, 1949 in the sum of $175.66, or one-fourth of the total sum of $702.64. She testified that cash was obtained on the check at the Bank and the money placed in an envelope and delivered to Mr. Hardesty, either by herself, Mr. Meadors, or Mr. Barnes, in her presence. The check stub No. 3084 bears the identifying mark of "J. H.", which she related she placed on the stub herself.

She further identified the First National Bank and Trust Company check executed by Baker Auto Salvage, by Mrs. John Baker, bearing date of October 24, 1949, made payable to "Cash" in the sum of $52.20; and likewise identified check stub No. 3087, to "Cash" for "J. H.", which indicated the cash went to J. W. Hardesty. Most of the transactions with Hardesty were identified by the initials "J.H.", but not all of them were so identified, as will hereinafter be set forth. She

likewise identified the bookkeeper's ledger sheet made under her direction, wherein it appears under "Truck Income" in red pencil that the cash obtained under check No. 3087, in the sum of $52.20 was an item in the red. All the items herein involved, and paid to Hardesty, appear on the bookkeeper's ledger in red pencil, indicating they were not true income, but all items of disbursement.

Mrs. Baker then testified concerning a billing by Baker Auto Salvage, bearing date of March 24, 1950, directed to the Tulsa County Commissioner's District No. 1, covering 22,878 gallons of road oil hauled at 2¢ per gallon, at a total sum of $457.56; and, a billing of June 7, 1950, covering 21,892 gallons of road oil, at a total cost of $437.84; and, another item bearing date of June 13, 1950, directed to the Tulsa County Commissioner's District No. 1 covering the total 27,572 gallons of road oil hauled at 2¢ per gallon, in the total amount of $551.44; and, an item of June 28, 1950, by the Baker Auto Salvage, to Tulsa County District No. 1, covering a total of 27,572 gallons of road oil, at 2¢ per gallon, or the total cost of $551.44; and, another item on June 21, 1950 from the Baker Auto Salvage to Tulsa County District No. 1, covering 19,078 gallons, at 2¢ per gallon, at a total cost of $381.56. Another item of May 31, 1950, from the Baker Auto Salvage, to Tulsa County District No. 1, covering a total of 17,132 gallons of road oil, hauled at 2¢ per gallon, or a total of $342.64. Payment for the above items was made through the County, and to cover one-fourth of the said hauling, or transportation charges, Mrs. Baker issued her check drawn upon the First National Bank and Trust Company, chargeable to the Baker Auto Salvage account; said check being No. 3522, dated July 25, 1950, in the sum of $723.22; the stub covering said check No. 3522 shows that the cash was to Baker Auto Salvage, for "Jim H.". This check bears an indorsement "Baker Auto Salvage, Mrs. John Baker." She testified that the cash thus received was given to Mr. Hardesty; that she knew he received it. She further identified the bookkeeper's ledger sheet

which shows under the item of "truck income" in red pencil, which indicated to her that the sum of $723.22 was disbursed to Mr. Hardesty.

Further, Mrs. Baker testified covering a billing by the Baker Auto Salvage, bearing date of August 11, 1950, directed to the Mid-Continent Petroleum Corporation covering 19,580 gallons of road oil at 2¢ per gallon, at a total cost of $391.60; payment therefor evidenced by the Mid-Continent Petroleum Corporation's voucher receipt, check No. 83,945, showing payment to the Baker Auto Salvage in the sum of $391.60, on August 23, 1950, for freight, or transportation charges covering said oil. Mrs. Baker related that pursuant to the unlawful agreement with Hardesty, she issued Baker Auto Salvage check No. 3596, drawn on the First National Bank and Trust Company, bearing date of August 28, 1950, in the sum of $97.90, in payment of the ½¢ per gallon, as payment to Hardesty. She identified check stub No. 3596, payable to "Mr. Cash" for "Jim Ha.". The bookkeeper's ledger sheet reflects that this item of $97.96 is carried in red pencil under "truck income", indicating to her that this item went to J. H. Hardesty. She testified that Jim Hardesty received this money.

Mrs. Baker then related she issued a billing from the Baker Auto Salvage Company under date of August 26, 1950, covering 19,252 gallons of road oil hauled at 2¢ per gallon, in the total sum of $385.04, and a billing from the Baker Auto Salvage bearing date of July 8, 1950, to Tulsa County District No. 1, covering 24,386 gallons of road oil hauled at 2¢ per gallon, in the total sum of $487.72, and a billing from the Baker Auto Salvage, bearing date of August 15, 1950, directed to the Tulsa County District No. 1, covering a total of 22,826 gallons of road oil, or a total sum of $456.52, and a billing from the Baker Auto Salvage, bearing date of August 11, 1950, to Tulsa County District No. 1, covering 27,340 gallons of road oil, or a total sum of $546.80. The first item directed to the Mid-Continent Petroleum Corporation appears to have been paid by its check No. 85,359, bearing date of September 6, 1950, payable to Baker Auto Salvage, in the sum of $385.04, for hauling, or transportation charges in relation to the 19,252 gallons of road oil. The record discloses further that payment was made by the County covering the four billings directed to the Tulsa County District No. 1. To cover Mr. Hardesty's ½¢ per gallon on the four billings of road oil, last above mentioned, Mrs. Baker issued her check No. 3613, drawn on the First National Bank and Trust Company, against the Baker Auto Salvage account, bearing date of September 11, 1950, in the sum of $469.02. Mrs. Baker's indorsement appears on the back of said check. Check stub No. 3613 appears to have been to "Jim", and scratched out with a pen, and "Cash" inserted thereafter, "For J. H.". The amount of the check was for $469.02. She testified that the proceeds of the check in the sum of $469.02 was given to Mr. Hardesty. Likewise, the Baker's check No. 451, of September 11, 1951, in the sum of $310.45, identified by Mrs. Baker, was actually a payment to Hardesty, which the stub of like number shows was for "Jim".

She then identified State's Exhibit No. 27. She testified that when they sent their claims in to the County, and got a check from the County, the gallonage was figured off of what they got. Exhibit No. 27 was a yellow sheet, with computations on it, showing the number of gallons hauled for the County, for which payment was received from the County between the dates of August 23, 1951, and August 29, 1951, and some from September 21, 1951, to September 25, 1951. Nine separate and distinct deliveries, totaling 39,980 gallons, at ½¢ per gallon, or a total sum of $214.-10, for hauling said oil, at the rate of ½¢ per gallon, as per the unlawful agreement with Mr. Hardesty. This Exhibit bears the notation "Mr. Hardesty", in the handwriting of the computer. She testified that Lloyd Barnes figured that sum for her. She saw him make the calculations. She was unable to produce the check covering said item, but did produce check stub No. 533, bearing date of November 5, 1951, to "Cash" for "J. H.", in the sum of

$214.10. The calculations above referred to were in the handwriting of Mr. Barnes. Mr. Barnes and Mr. Middaugh were both bookkeepers; Mr. Barnes helped Mr. Middaugh. Mrs. Baker related that these items were made in the regular course of business; she saw the items reflected in Exhibit No. 27 made. She testified that proceeds, as evidenced by check stub No. 533, was paid to Jim Hardesty.

Mrs. Baker then identified check stub No. 5120 dated August 18, 1952, showing a disbursement for "Cash" of $150.20. The stub bore the identifying mark of "J. H.". She further identified check No. 5120 in said sum. She testified that the proceeds from this check went to Mr. Hardesty. She further identified the Baker's check No. 5185, of September 22, 1952, in the sum of $434.60, which appears on the stub of like number to have been issued "For J. H., Sales Expense", but was actually a payment to Hardesty for ½¢ per gallon kickback. She then identified check stub No. 5241, bearing date of October 27, 1952, for "Cash" in the sum of $373.20. She likewise identified check No. 5241, dated October 27, 1952, for said sum. The stub of this check bore the identification mark of "J. H.". She testified that this check was cashed, and bore her indorsement; the proceeds of which went to Mr. Hardesty.

The foregoing transactions, their character and nature, are sufficient to demonstrate the methods employed in conducting the conspiracy. It would needlessly burden this opinion with monotonous repetition to relate each and every separate transaction, and that is not necessary. It suffices to state that there were a total of twenty-four (24) separate and distinct transactions with Hardesty, by the Bakers and the Brysons, as reflected by the checks offered in evidence, showing that he received the total sum of $6,039.01, from July, 1949, to June, 1953. The scope of these operations are further illustrated by sixty-six (66) billings, invoices, and other Exhibits, which reflect that there were almost Two and One-half Million Gallons of road oil involved in these operations. The very nature of the conspiracy, as a profitable operation for Hardesty and his conspirators, was conducive to a needless and wasteful use of road oil, by Hardesty.

Mrs. Baker's testimony in relation to the sums paid to Hardesty under the agreement is substantiated by the repetitious nature of the circumstances, as well as in the method of recording the transactions, such as "For J. H.", "Jim H.", "Jim", and "For J. H., Sales Expense", etc., and the monotonously repeated withdrawals of money from the bank for payments to Hardesty. These payments were in sums of an even one-fourth of the sums paid for hauling, at the rate of 2¢ per gallon. Substantiation of the testimony of Hardesty's co-conspirators is also found in the abortive attempts to hide the nature of the conspiracy with ink eradicator on one stub, and by burning another. If these transactions would stand the light of inspection, why cover them up? It is obvious they would not. Moreover, these repetitious transactions, and the manner of handling them, were not coincidental. They were not products of a doodling mind, but, we are convinced, were deliberate attempts on the part of Hardesty's co-conspirators, as protective measures by the Bakers and their successor, Bryson. It appears both the Bakers and Bryson wanted to be able to account for these sums by means of record evidence, in order to satisfy the income tax ferret, and thus avoid payment of income tax on money they paid out, as an item of expense. All these combinations of circumstances and facts enlarge the picture of fraud to where the preparation for abandonment of ship becomes patently obvious. These little devices were rafts of self-preservation designed to protect Hardesty's co-conspirators, and afford safety and rescue, when "the old ship Conspiracy against the State" broke up on the rocks of discovery. The sad commentary on such a situation is that only the master of this scheme to defraud must perish. He is left chained to the mast by his deserters. The other just-as-unworthy seamen escape the wreckage, and the penalties of their crime, through the device or life line of "State's evidence". Hence, we find credence in the old adage, "it takes a thief to catch a thief." How-

ever, in the interest of public security, the State must oftentimes resort to such procedure for the protection of its own interests.

Not only do we find evidence of corroboration in the foregoing circumstances, but the manner in which the cash was delivered to Hardesty by envelopes containing the money, is adequately corroborated by bookkeeper Middaugh, and Filling Station Operator, Kenneth Goodman. Middaugh testified that Mrs. Baker gave him two envelopes to deliver to Mr. Hardesty. The testimony of Carl Middaugh, in this regard, might be questioned on the contention that he was a co-conspirator. Middaugh testified that he was not present when the conspiracy was formed, and his testimony indicated that he was not culpably implicated in such a way as to make him criminally corrupt, or possessed of criminal intent, as to the part he played in the transactions involved with Hardesty; Palmer v. State, 93 Okl.Cr. 357, 228 P.2d 391; Doser v. State, 88 Okl.Cr. 299, 203 P.2d 451; Fitzgerald v. State, 85 Okl.Cr. 376, 188 P.2d 396; Finley v. State, 84 Okl.Cr. 309, 181 P.2d 849, wherein we held that the true test as to whether a person is an accomplice, requiring corroboration of his testimony, is whether his participation in the crime was such as to make him criminally corrupt. In this connection, the court instructed the jury as to the witness, Carl Middaugh, "you are instructed that you are to determine from the foregoing instructions, whether or not he is an accomplice to the crime, of which the defendant herein stands charged, and if you determine that he is an accomplice, then you are instructed that you cannot convict the defendant upon the testimony of said witness, unless you find that such testimony is corroborative * * *." Under this instruction, we are compelled to conclude, from the jury's finding, that they did not believe Carl Middaugh was a co-conspirator, and we do not believe this record establishes him as a co-conspirator. In giving the foregoing instruction, the court followed the procedure which had been approved in Spivey v. State, 69 Okl.Cr. 397, 104 P.2d 263. Sufficiency of corroboration has been held a question for the jury. Rushing v. State, 88 Okl.Cr. 82, 199 P.2d 614, 615.

Kenneth Goodman testified that on four or five occasions, he saw the defendant receive envelopes from Mrs. Baker at the office of the Baker Salvage Company, located at 48 North Peoria, Tulsa, Oklahoma. He further related that he had seen the defendant at the Baker Auto Salvage fifteen or twenty times between 1949 and 1953. To this testimony, the defendant objects that this merely constitutes evidence showing a connection between Hardesty and his co-conspirators, and does not connect him with the crime itself. With this contention, we are not in accord, for certainly this is corroboration of a material matter, testified to by Mrs. Baker, tending to connect Hardesty with the crime. This holding is supported by Rushing v. State, supra, wherein this court said:

"Evidence corroborative of an accomplice need not directly connect the defendant with the commission of the crime; it is sufficient if it tends to connect him with its commission.

"Evidence corroborating an accomplice and tending to connect the defendant with the commission of the crime need not be direct, but may be circumstantial only.

"Where there is evidence in corroboration of an accomplice tending to connect a defendant with the commission of the crime charged, the sufficiency of such corroborating evidence is for the jury.

"Where the sufficiency of the evidence to corroborate an accomplice is challenged, this court will take the strongest view of the corroborating testimony that such testimony will warrant, and, if it can say that there is corroborating evidence tending to connect the defendant with the commission of the offense, it will uphold the verdict."

In Blumhoff v. State, 72 Okl.Cr. 339, 116 P.2d 212, 215, quoting from Scott v. State, 72 Okl.Cr. 305, 115 P.2d 763, the court quoted the rule, as follows:

"'The rule, simply stated, is that the testimony of an accomplice must be corroborated by other evidence tending to connect defendant with the commission of the offense; that it is not necessary that such testimony, standing alone, should be sufficient to convict defendant; and that incriminating circumstances shown by the evidence are sufficient, if they tend to connect the defendant with the commission of the offense. * * *

" 'It is not essential that the corroborating evidence shall cover every material point testified to by accomplice or be sufficient alone to warrant a verdict of guilty. If the accomplice is corroborated as to one material fact or facts by independent evidence tending to connect the defendant with the commission of the crime, the jury may from that infer that he speaks the truth as to all. Such corroborating evidence, however, must show more than the mere commission of the offense or circumstances thereof.' Davenport v. State, 20 Okl.Cr. 253, 202 P. 18; Henson v. State, [69 Okl.Cr. 273] 101 P.2d 1060; Bliss v. State, 47 Okl.Cr. 225, 287 P. 778; Hathcoat v. State, [71 Okl.Cr. 5] 107 P.2d 825."

We are of the opinion that, measured in light of the foregoing authorities, the testimony of Middaugh and Goodman, as to a material fact, related by Mrs. Baker, when believed by the jury, constitutes sufficient corroboration to sustain its verdict.

Under the agreement adopted by the Bakers' successor, Dale Bryson, in the business with the Bakers, Mrs. Claudia Bryson, the wife of Dale Bryson, worked in the office of her husband's business. She was not a bookkeeper and had to depend upon the services of Lloyd Barnes, and Dale Bryson, for directions as to the part she played in the business. She testified that she kept a cash book (admitted in evidence), made the deposits, and wrote the checks on the Company account. She identified check stub No. 89, which was marked "void", and she said it had been originally written in the sum of approximately $300. It appears that ink eradicator was used on check stub No. 89. Ultraviolet light was used on check stub No. 89, to restore its notations made in ink. (One not versed in such procedure would not realize that the ink eradicator only eliminates the color, but does not eradicate the other substance in the ink, and when a writing, upon which ink eradicator has been used, is exposed to ultra-violet light, the residue of the ink becomes fluorescent in its aspects, and it can then be photographed.) Check stub No. 89, being thus photographed, clearly reflects that the stub was written on June 20, 1953, to Jim Hardesty, for advertising in the sum of $303.80; but, for what advertising, does not appear. Hardesty was not in the advertising business; and as County Commissioner, had no campaign requiring advertising at that time. The testimony in relation to the ultra-violet light was given by Robert L. Travis, Chief Identifications Officer and Questioned Document Examiner for the Department of Public Safety, who examined and photographed check stub No. 89.

Mrs. Bryson further testified in relation to check No. 92, bearing date of July 21, 1953, drawn upon the account of Baker Transport Company, by Claudia Bryson, directed to the Peoples State Bank, payable to "Cash" in the sum of $303.80. She also testified in relation to check stub No. 92, bearing date of July 21, 1953, showing the check was payable to "Cash". This stub was likewise marked "void". In the lower left hand corner of check stub No. 92, it appears an attempt was made to obliterate a notation thereon, by burning the same. Mrs. Bryson testified that she had written thereon the initials "J. H." under the direction of either Barnes, or Bryson, and that someone else had written "void" across the check stub in red ink.

Mrs. Bryson then identified in relation to a Baker Transport Company billing, bearing date of June 22, 1953, directed to the Mid-Continent Petroleum Corporation, covering 39,480 gallons of road oil hauled at 2¢ per gallon, or a total sum of $789.60, which the Mid-Continent Petroleum Corporation paid by its check No. 22,625 on July 1, 1953, to the Baker Auto Salvage, of Tul-

sa, Oklahoma, the sum of $789.60, for freight, or transportation charges for hauling the aforesaid oil, as evidenced by voucher receipt. Mrs. Bryson testified that on July 2, 1953, she deposited in the Bank the sum of $789.60, which was received from the Mid-Continent Petroleum Corporation for hauling the 39,480 gallons of oil. The record discloses, as reflected by State's Exhibit 105, that she kept her individual cash ledger, wherein the deposit is reflected in her book. Mrs. Bryson next testified in relation to a Baker Transport Company billing, of June 27, 1953, to the Mid-Continent Petroleum Corporation, covering 21,280 gallons of road oil hauled at 2¢ per gallon, for the total sum of $425.60. It appears, as reflected by the voucher receipt, that the Mid-Continent Petroleum Corporation issued its check No. 23,393, dated July 8, 1953, in payment of the charge of $425.60, for transportation charges, or hauling of the 21,280 gallons of oil. Mrs. Bryson's cash ledger (State's Exhibit 105), disclosed that on July 9th, 1953, she deposited in the Bank the sum of $425.60. This item, together with the item of $789.60, appears in her cash book under "Truck Income". Thereafter, she issued her check No. 92 in the sum of $303.80, payable to "Cash", drawn on the account of Baker Transport Company, by Claudia Bryson, as of July 21, 1953, corresponding to stub No. 92 hereinbefore referred to. She testified that in making these entries as she did, and in preparing the checks as she did, she was directed by Mr. Barnes with reference to the bookkeeping, because neither she nor her husband knew anything about bookkeeping.

It further appears that Richard E. Pierce, Billing Supervisor for the Mid-Continent Petroleum Corporation, identified the loading tickets covering the oil sold and delivered to the County, and for which the Mid-Continent Petroleum Corporation billed the County for both the hauling charges, and the oil. Forrest Steele, Freight Clerk for the Mid-Continent Petroleum Corporation testified that under the date of July 8, 1953, the Mid-Continent Petroleum Corporation paid the Baker Transport Company $425.60 for hauling

the hereinbefore referred to oil, and that on July 1, 1953, the Mid-Continent Petroleum Corporation paid the Baker Auto Salvage the sum of $789.60 for hauling the 39,480 gallons of oil. Thus, it appears that the Mid-Continent Petroleum Corporation sold to the County, and collected from the County and remitted to the Baker Transport Company, and Baker Auto Salvage, for hauling, the total sum of $1,215.20, and that ½¢ per gallon thereof would equal the sum of exactly $303.80. Under the unlawful agreement, such sum would be due Hardesty for which Mrs. Bryson, acting under the direction of Barnes, and her husband, drew check No. 92 in payment thereof. Apparently someone attempted to obliterate on the check stub the initials "J. H.". Apparently a check evidenced by stub No. 89 was drawn on June 20, 1953, made payable to Jim Hardesty, for advertising in the sum of $303.80. We do not believe that it is illogical to conclude that: first, contrary to the cover-up plans of the conspirators, payment was made by the novice, Mrs. Bryson, by check No. 89, unintentionally to Jim Hardesty, as payee, and an attempt was made by ink eradicator to eradicate from the check stub what had already been destroyed in the check. Subsequently, stub No. 92 was marked "void", apparently to eliminate, if possible, the transaction from future consideration, but,

"The Moving Finger writes; and, having writ,
Moves on: nor all your Piety nor Wit
Shall lure it back to cancel half a Line
Nor all your Tears wash out a Word of it",

applies herein, only because of modern methods of detection. In our opinion, the foregoing circumstances, and many others, are entirely adequate to connect Hardesty with the crime.

The defendant in his testimony denied the formation of the conspiracy; that he ever met with the Bakers, as they testified he did, or that he in any way was involved in receipt of any of the moneys which witnesses testified he received. This denial carries little weight, in view of the defendant's own admission to the effect that some time in July of 1953, he received from

Dale Bryson an even sum of $300. This admission, in light of all the facts, excludes every theory of innocence. He testified that Bryson gave him this money for his Campaign Fund, but admitted that 1953 being an off year, he had no Campaign Fund, and that he put the $300 in his regular checking account. The foregoing admission, in light of the substantiating transactions involving the checks and stubs No. 89 and No. 92, in the sum of $303.80, no doubt conclusively established in the minds of the jury that Hardesty received the sum of $303.80 in cash from the Brysons, and put $3.80 in his pocket for petty cash purposes, and led them to conclude, deposited the $300 in his bank account, as he testified he did. Hence, we are of the opinion, the evidence amply supports the conviction.

In Hutchman v. State, 61 Okl. Cr. 117, 66 P.2d 99, 104, it was said:

"The courts of this country have often held that it is not necessary that a conspiracy be proved by direct testimony, in fact, conspiracies are seldom susceptible to such proof. It is often proved by circumstances. We call attention to the case of Mathews v. State, 19 Okl.Cr. 153, 198 P. 112, 117, wherein the court says:

" 'A conspiracy, leading up to the commission of the crime charged need not be established by direct evidence, but may and generally must be proved by a number of independent acts, conditions, and circumstances. The very existence of a conspiracy is generally a matter of inference deduced from certain acts of the persons accused, done in pursuance of an apparently criminal or unlawful common purpose.' "

This conviction is not only supported by circumstantial evidence, but by direct proof. The evidence herein produced was sufficient to create a question of fact for the jury, and the evidence being sufficient to support the finding of guilt, the same will not be vacated or set aside on appeal for insufficiency of evidence. Sadler v. State, 84 Okl.Cr. 97, 179 P.2d 479, and numerous other authorities to that effect. It cannot be successfully contended that the evidence herein is as consistent with innocence as it is with guilt.

We cannot help but issue a word of warning to others who may be tempted to likewise violate their public trust. Each such persons so tempted may well take heed of the fate of this unfortunate defendant who sought to enrich himself at the expense of Tulsa County. He might well have succeeded had it not been for the fact that self-preservation is the first law of nature. The slightest consideration on his part would have revealed the fact that his co-conspirators would be the first to seek refuge when the light of discovery began to shed upon them, and that he would be left standing isolated and alone, without any friends to help extricate him from the bog of greed.

Defendant further complains there is a variance in the pleadings, and the proof. As was said by Judge Powell, in Sykes v. State, 96 Okl.Cr. 9, 246 P.2d 379, 382:

" * * * the immediate question is, what constitutes a variance in a criminal case. In Hatley v. State, 72 Okl. Cr. 69, 113 P.2d 396, 397, it is said:

" ' "A variance in a criminal case is an essential difference between the accusation and the proof. A variance is not material unless it is such as might mislead the defense or expose a defendant to being put twice in jeopardy for the same offense." '

"See also Herren v. State, supra [72 Okl.Cr. 254, 115 P.2d 258]; Brashears v. State, 38 Okl.Cr. 175, 259 P. 665; Woods v. State, 22 Okl.Cr. 365, 211 P. 519; Tiger v. State, 54 Okl.Cr. 202, 16 P.2d 889."

Numerous exhibits were admitted in evidence, which Hardesty contends have reference to transactions between Baker Auto Salvage Company, or Baker Transport Company, with the Mid-Continent Petroleum Corporation. He complains that there is no allegation in the indictment mentioning the Mid-Continent Petroleum Corporation. The indictment herein charges but one conspiracy. However diverse its objects, the gist of the crime herein charged

is that the Bakers, Brysons, and Hardesty, entered into a conspiracy whereby Hardesty was to be unlawfully enriched at the expense of the State, under and by virtue of contracts entered into by Hardesty and the County in which he was to receive kickbacks, and in which contracts he thus would be indirectly interested. In Phillips v. State, Okl.Cr., 267 P.2d 167, 168, this court said:

> "An information or indictment which, construed under the ordinary rules of construction, states all the essential elements of the crime charged sufficiently to enable a person of common understanding to know what is meant, and with sufficient particularity to enable a defendant to prepare for his trial, and to plead the judgment in bar, if again informed against for the same offense, is sufficient."

See also, Hunter v. State, Okl.Cr., 264 P.2d 997. In Moore v. State, 96 Okl.Cr. 118, 250 P.2d 46, it was said:

> "Even where a variance exists between information and proof, it is not material unless it is such as might mislead the defense, or expose the defendant to injury of being put twice in jeopardy for the same offense."

McCoy v. State, 92 Okl.Cr. 412, 223 P.2d 778; Argo v. State, 88 Okl.Cr. 107, 200 P.2d 449; Armour v. State, 72 Okl.Cr. 44, 112 P.2d 1116; Marks v. State, 69 Okl.Cr. 330, 102 P.2d 955, and numerous other cases to the same effect. Likewise, it has many times been held that the true test as to the sufficiency of an information, is not whether it might possibly have been made more certain, but whether it contains every element of the offense intended to be charged, and sufficiently apprises the defendant as to what he must be prepared to meet. Salisbury v. State, 80 Okl.Cr. 13, 156 P.2d 149; Dunbar v. State, 75 Okl.Cr. 275, 131 P.2d 116; and, Sparkman v. State, 67 Okl.Cr. 245, 93 P.2d 1095. This indictment meets all such requirements. Moreover, the proof as to the transactions with the Mid-Continent Petroleum Corporation merely goes to show the scope of the conspiracy, which must be gathered from the testimony, and not from the averments in the indict-

ment. This proof does not constitute a variance, but is one of many incidents established in the proof to show consummation of the conspiracy. This proof in no way altered the objects and purposes of the conspiracy, but tended only to show the Mid-Continent Petroleum Corporation to be an innocent conduit through which the designs of the conspiracy were consummated. Terry v. U. S., 9 Cir., 7 F.2d 28. An indictment need not recite evidentiary matters, since the pleader is not required to plead his proof. 15 C.J.S., Conspiracy, § 80, p. 1112, note 80, Craig v. U. S., 9 Cir., 81 F.2d 816; certiorari dismissed 298 U.S. 637, 56 S.Ct. 670, 80 L.Ed. 1371; Mercer v. U. S., 3 Cir., 61 F.2d 97; Lefkowitz v. Schneider, 3 Cir., 51 F.2d 685. Under the circumstances herewith presented, the fact that the Mid-Continent Petroleum Corporation was not mentioned in the indictment, does not constitute a variance, since to plead a conspiracy it is not necessary to charge all the elements of evidence essential to the proof of the conspiracy and its operations. The indictment is sufficient if the offense is charged in such specific terms that accused is thereby informed of its nature, and that the jury may easily understand the nature of the offense charged. 15 C.J.S., Conspiracy, § 80, p. 1112, Note 78. The foregoing principles are fundamental. An examination of the indictment herein clearly establishes its sufficiency, and the evidence discloses no variance in the pleadings and the proof.

What has been said hereinbefore applies with equal force to the proof that Lloyd Barnes and Carl Middaugh delivered envelopes containing money to the defendant. See also Lefkowitz v. Schneider, supra. Therefore, we are of the opinion this contention is likewise without merit.

In the next proposition the defendant alleges that the trial court erred in sustaining the State's motion to strike the defendant's motion for new trial, on the grounds of newly discovered evidence. This contention is predicated upon the proposition that Mrs. Gertrude Cruzan Halbrook was mentally ill at the time she served as a juror in this case. On this point, it appears from the record that the trial was commenced on

the 1st day of March, 1954, and a verdict of guilty was rendered on March 5, 1954. A motion for new trial was filed on the 31 day of March, 1954, in which the issue of Mrs. Halbrook's mental competency was not raised. The motion was overruled, and the defendant was sentenced. It appears that thereafter, on May 24, 1954, after the lapse of two months and nineteen days, following the trial, Mrs. Halbrook was adjudged insane, and committed to the State Hospital at Vinita, Oklahoma, on the 26 day of May, 1954. It appears that counsel for defendant learned of this action in the early part of June, 1954. They waited, however, until the term of court had expired, and filed a motion on August 11, 1954, attacking the judgment and sentence on the ground that Mrs. Halbrook was mentally ill at the time she served on the jury.

It is conceded by both the County Attorney and defense counsel, that an extensive individual examination of the jurors was conducted in this case on voir dire relative to everything, except mental competency of the jurors. It is pertinent to observe that on all questions touching upon the juror's competency, nothing was said in the answers by Mrs. Halbrook to indicate unsoundness of mind. Apparently, her service on the jury did not create any suggestion of incompetency, among her family or her friends. Not only is this true, but evidently nothing occurred during the trial to arouse the slightest suspicion of defendant's counsel that the juror was of unsound mind. It is apparent that both her answers on voir dire examination, and her conduct as a juror was so normal, that counsel did not suspect anything in this regard, until they discovered more than two and one-half months after the verdict, that Mrs. Halbrook had been committed to the State Hospital. Hence, there is significance in the fact that the defendant delayed so long in raising this issue.

Under the provisions of 22 O.S.1951 § 658, among

"General causes of challenges are:

"1. A conviction for felony.

"2. A want of any of the qualifications prescribed by law, to render a person a competent juror, including a want of knowledge of the English language as used in the courts.

"3. Unsoundness of mind, or such defect in the faculties of the mind or organs of the body as renders him incapable of performing the duties of a juror."

It is apparent this question falls within the third section of the statute. In Butler v. Greensboro Fire & Ins. Co., 196 N.C. 203, 145 S.E. 3, 4, it was said, that under the common law, challenges for cause were divided into four classes, as follows:

"Propter honoris respectum, out of respect of rank or honor; propter defectum, on account of some defect; propter delictum, on account of crime; and propter affectum, on account of affection or prejudice."

4 Bl. 352; State v. Levy, 187 N.C. 581, 122 S.E. 386, 387. On the question of disqualification propter defectum, voir dire examination must be conducted relative thereto.

In the absence of such examination, the matter is held to be waived. In Parish v. State, 77 Okl.Cr. 436, 142 P.2d 642, this court, speaking through Judge Jones, said:

"It is the duty of the defendant to question the jurors on their voir dire as to their qualifications; and if he fails to do so, he waives any objections on that point, even though the disqualification is unknown to him until after the rendition of the verdict.

"The disqualification of bodily infirmity amounting to a disability is cause for challenge of a juror propter defectum, on account of personal objection, and if, voluntarily, or through negligence or want of knowledge, such objection fails to be insisted on, the conclusion that the judgment is thereby invalidated is wholly inadmissible. The defect is not fundamental, as affecting the substantial rights of the accused, and the verdict is not void for want of power to render it."

See also Boyd v. State, 97 Okl.Cr. 331, 263 P.2d 202, 205, wherein it was said:

"It is clearly evident that the defendant under the conditions hereinbefore

set forth waived the right to challenge any juror for any particular cause. In Allen v. State, 70 Okl.Cr. 143, at page 152, 105 P.2d 450, at page 454, it was said:

" 'The right to challenge any juror for any particular cause is a statutory right and may be waived by the defendant or his counsel. Queenan v. Territory, 11 Okl. 261, 71 P. 218, 61 L.R.A. 324, affirmed on appeal to United States Supreme Court, 190 U.S. 548, 23 S.Ct. 762, 47 L.Ed. 1175.

" 'It is supposed in the voir dire examination counsel for defendant will go thoroughly into the qualifications of the jurors; and if it develops that any of the jurors are disqualified by reason of any statutory ground, that a challenge for cause will be made and sustained.' "

Herein, we are only concerned with the disqualification propter defectum, on account of mental incompetency. A case in point with the case at bar is Durham v. State, 182 Tenn. 577, 188 S.W.2d 555, 557, 160 A.L.R. 746, wherein a juror's fitness was challenged, after verdict, on motion for new trial, on the grounds of mental incompetency. Therein, it was said: .

"*There is no charge or showing that he was not an impartial juror. This challenge came too late.* Objections based on general disqualifications, such as age, residence, relationship, *feeble mindedness and the like are of the propter defectum class,* to which the rule applies that the challenge shall be made before verdict. This is the general rule and has been declared in numerous of our cases, among these being Walker v. State, 118 Tenn. 375, 99 S. W. 366; Monday v. State, 160 Tenn. 258, 23 S.W.2d 656; Hamilton v. State, 101 Tenn. 417, 47 S.W. 695; Cartwright v. State, 80 Tenn. 620. In the last named case the Court pointed out the distinction between those cases where the juror is found to have been incompetent propter defectum, as for relationship, etc., and where he is found to have been incompetent because he had prejudged the case, when a different rule applies as to the time of challenge.

"Conceding that one who had been at one time adjudged insane, and confined for years on this ground, might well be rejected for service as a juror to try a case calculated to stir the passions and disturb the mental equilibrium of men, the challenge must be presented upon his voir dire examination."

▆▆ Herein, there was no assertion that Mrs. Halbrook was not an impartial juror. The Constitution guarantees the defendant a speedy and public trial by *an impartial jury.* O.S.1951 Const. Art. II, § 20. It does not guarantee the defendant against defects propter defectum, in the absence of inquiry on the point, and objection before the verdict. This holding is in harmony with what was said in Cooper v. State, 27 Okl.Cr. 278, 226 P. 1066. Where "the disqualification" is cause for challenge propter defectum, on account of personal objection and, if voluntarily, or through negligence or want of knowledge, such objection fails to be insisted upon, the conclusion that the judgment is thereby invalidated is wholly inadmissible. The defect is not fundamental, as affecting the substantial rights of the accused, and the verdict is not void for want of power to render it.

▆▆ Moreover, the question of the mental incompetency of Mrs. Halbrook being a matter propter defectum must have been raised before verdict, and therefore is not a matter to be reached by motion for new trial on the grounds of newly discovered evidence. Durham v. State, supra, and Lindsey v. State, 57 Ga.App. 158, 194 S.E. 833, both holding that objection to jurors propter defectum are grounds for challenge but not grounds for new trial, even though the defendant did not know of the defect until after verdict. The defense herein confuses defects propter affectum with defects propter defectum. Defects propter affectum, the basis for which is prejudice, may be raised on motion for new trial. Stevens v. State, 94 Okl.Cr. 216, 232 P.2d 949. See also Yellow Cab Corp. v. Henderson, 178 Va. 207, 16 S.E.2d 389, holding it is too late after a verdict to object to the competency of a juror, except

upon the ground of prejudice, or ground of propter affectum. Objection to a juror on the ground of personal incapacity comes too late after the verdict. Thurman v. Commonwealth, 107 Va. 912, 60 S.E. 99. These authorities are in accord with Parish v. State, supra. In that case, the verdict was attacked on the ground that R. W. Reeves was disqualified for jury service because of deafness. Therein, the objection was held waived by failure of the defendant to question the juror on voir dire as to his fitness. It was said therein, "the defendant must exercise diligence to ascertain the qualifications of jurors at the time they are examined for that purpose", citing a long list of authorities in support thereof. It is conceded by counsel for defendant that they made no inquiry on the point of Mrs. Halbrook's mental competency to serve as a juror; hence the objection on that ground, which was not asserted until long after the verdict, comes too late. It was therefore not error for the trial court to sustain the State's motion to strike the defendant's motion for new trial on the ground of newly discovered evidence.

■ The final proposition urged by the defendant is that the trial court erred in permitting the State to introduce hearsay evidence of the alleged appraisal of the defendant's home in the sum of $41,780. This testimony was offered by the State through Mr. Nathan Carter, Secretary of the Bomford Brothers Company. The defendant testified that the house only cost him probably $23,000. Mr. Carter did not make the appraisal, but the appraisal of the house was made by Mr. Leo W. Grimes, Executive Vice-President of the Bomford Brothers Company, who was out of town for the day at the time of trial. There is no question but that this testimony of the appraisal, admitted herein, was hearsay, and was inadmissible.

But, we are further of the opinion that, the erroneous admission of this evidence must be measured in light of the following facts. It appears that the hearsay appraisal was offered only after the trial court had erroneously rejected, what appears from the record, would have been clearly competent evidence to impeach the defendant's

testimony that his house probably cost $23,000. A predicate was laid for such impeachment when Hardesty was asked the following questions, and gave the following answers concerning an application for a loan made to Bomford Brothers: On cross-examination of Mr. Hardesty:

"Q. And, as a matter of fact, Mr. Hardesty, isn't it true that when you obtained your loan on that house, that you advised the Loan Company, that $24,000.00 had already been paid, and they took a note for $16,000.00, isn't that right? A. No, sir, that is not correct; that is not correct, no sir."

And then on rebuttal testimony, Mr. Carter, of Bomford Brothers, was asked the following questions, and gave the following answers:

"Q. Let me ask you this, Mr. Carter, when was this loan applied for, and made, what year? A. The year 1951 * * *.

"Q. During that time, was Regulation X in effect? A. It was * * *.

"Q. Does that apply on a conventional loan, or was that just F.H.A.? A. That applied upon all borrowing of all loans of this nature.

"Q. Was there a requirement, that the applicant for a loan, certify to the United States Government, the cost of construction of a home, or any other property? A. There was.

"Q. Does your file reflect whether certification by the defendant in this case of anticipated cost upon the property involved, upon which he wanted to obtain a loan? A. Yes * * *."

Objection was made by counsel for the defendant "that this was not in any way, a collateral issue, if the court please. We will be trying another issue entirely." Whereupon, the court sustained the objection.

"Q. Do you have in your files, Mr. Carter, a signed statement by the defendant, reflecting his statement of the cost of construction of the property upon which he was attempting to secure a loan?"

Objection was made on the same grounds, and was by the court sustained. Then the question was asked by the State:

"Q. Do your records reflect, Mr. Carter, the amount of money which had been paid on the construction of the property for which the loan was sought, together with the amount of money needed to complete the cost of the house?"

Objection was made that such matter was incompetent, etc., and an attempt to impeach the defendant upon an immaterial issue. Objection was sustained by the trial court.

Thereafter, Carter was asked questions concerning the hereinbefore mentioned appraisal by his Company. It was then sought to be shown by Mr. Carter, that the appraisal of $41,780 was approximately the same as the statement of the defendant to the United States Government as to the cost of construction. This evidence was objected to, and the objection was sustained. No effort was made by the State to offer in evidence, the certification required by the United States Government, and signed by the defendant. It thus appears from the predicate laid, that if the certification had been offered in evidence, as required by the United States Government, and apparently signed by the defendant, that the same might have constituted admission against interest by the defendant as to the value of his property, entirely contradictory to his testimony that the same had a value of $23,-000. Only after the obviously admissible evidence which the County Attorney so vainly attempted to introduce, was rejected by the trial court, the State was then permitted to make proof of the Loan Company's appraisement by means of the hearsay evidence given by Mr. Carter. Thus, the trial court appears as a baseball umpire attempting to even the score, with a clearly erroneous ruling to cure a preceding bad ruling.

■ We are convinced that the trial court greatly erred against the State in rejecting what, upon the face of this record, appears would have been thoroughly competent proof to have impeached Mr. Hardesty on the point of the value of his home.

Hence, this appears as harmless error, which would likely not occur on a new trial. It is obvious that, on a new trial, defendant would be in much the worse position, in this regard, and the result would not be altered. Therefore, we are of the opinion that, in light of the record as a whole, the evidence of Mr. Carter was not of such a nature as to substantially affect the defendant's rights. In any event, the accused has the burden in the Criminal Court of Appeals of showing that he was prejudiced in his substantial rights by the commission of the error he relies upon for reversal, and the appellate courts will not reverse for rulings on evidence on trial errors unless the record discloses a miscarriage of justice, or that the errors substantially violate constitutional or statutory rights. Cotter v. State, 74 Okl.Cr. 304, 125 P.2d 777. The record herein does not disclose that the defendant, Hardesty, suffered such substantial injury by the admission of this incompetent evidence in relation to the appraisal on his home. The defendant stands almost without defense, except for categorical denials, obliterated by his confession of unlawfully receiving money, in the sum of $300, at about the time the check for $303.80 was cashed. The proof of this payment to him strongly confirms his guilt. Moreover, he could not erase the avalanche of documentary proof, which overwhelmed him. The checks offered in evidence show payment to Hardesty, of a total of $6,391.-01. To reverse this case for the admissibility of this hearsay evidence, in the face of clear and conclusive guilt, would be contrary to established law. We are aware of the fact that in every case, a few errors are committed, but we are of the opinion that this record shows a trial in substantial compliance with the law.

■ It should be distinctly understood, however, that in an ordinary case, such evidence might be regarded as reversible error. But this is not an ordinary case. As was said by Judge Jones, in Burns v. State, 72 Okl.Cr. 432, 117 P.2d 155, at page 162, "Those in public positions should maintain themselves with scrupulous fidelity to their cause. There is no place in our public affairs for officials without honor and integ-

rity." To this we add, a public official who breaches the trust imposed in him by the public will be held to the highest degree of accountability, to protect the public interest. Hence, when this case is viewed in light of the overwhelming evidence of guilt, we are enabled to invoke the provisions of 22 O.S.1951 § 1068, and apply the harmless error rule herein.

Nevertheless, the defendant urges if the Court does not see fit to reverse the conviction, because of the errors committed by the trial court, the penalty should be reduced. We are of the opinion that under all of the circumstances of the case, there is merit in that contention, for we feel that if the accused serves the Penitentiary sentence, he will have been sufficiently punished, and the ends of justice satisfied.

It is therefore the order that the sentence of the District Court of Tulsa County be modified to a term of 18 months in the Penitentiary and, as modified is affirmed.

Petition for rehearing is denied, and the Mandate is ordered to issue forthwith.

JONES, P. J., and POWELL, J., concur.